UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY (NEWARK)

*14-3960*
*(SDW)*

_____ X     CASE NO. **10-CR-00471**

UNITED STATES OF AMERICA,

    Plaintiff.

vs.

NEVIN SHAPIRO,

    Defendant.

_____ X

RECEIVED

JUN 2 0 2014

AT 8:30 _____ M
WILLIAM T. WALSH, CLERK

# PETITIONER'S SUPPLEMENTAL FACTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO CORRECT VACATE, AND/OR SET-ASIDE SENTENCE AND CONVICTION PURSUANT TO TITLE 28 U.S.C. § 2255

    The Defendant, NEVIN KAREY SHAPIRO (hereinafter "Mr. SHAPIRO"), hereby files the

instant Supplemental Facts and Memorandum of Law and Argument in Support of Motion to

Correct, Vacate, and/or Set-Aside Sentence and Conviction Pursuant to Title 28, United States Code,

Section §2255, and in support thereof proffers the following:

## I. SUMMARY OF PROCEDURAL HISTORY:

    On April 21st, 2010, Mr. SHAPIRO self-surrendered to authorities based on the filing of a

criminal complaint which alleged Mr. SHAPIRO knowingly and intentionally conspired with six (6)

other co-conspirators to commit securities and wire fraud, in violation of Title 15, United States

Code, Section §78j(b) and 78ff(a), Title 17, Code of Federal Regulations, Section §240-10b-5, and

Title 18, United States Code, Section §2; and Money Laundering in violation of Title 15, United

States Code, Sections§78j(b) and 78ff(a), Title 17, Code of Federal Regulations, Section §240.10b-5,

and Title 18, United States Code, Section §2, that were of a value greater than $10,000.00 dollars

and that were derived from specified unlawful activity, in violation of Title 18, United States Code, Section §1957. **[D.E. 7 and D.E.14]**

Mr. SHAPIRO was formally charged in a six (6) count Indictment on July 14th, 2010, at which time he was accused of knowingly and intentionally conspiring with others known and unknown, to commit offenses against the United States, to wit: conspiracy to commit securities and wire fraud, in violation of Title 15, United States Code, Section §78j(b) and 78ff, Title 17, Code of Federal Regulations, Section §240.10b-5, and Title 18, United States Code, Sections §§ 371, 981(a)(1)©, 982(a)(1), 1343, 1957, and 2; 28 U.S.C. §2461©. **[D.E.14.]**

Mr. SHAPIRO subsequently appeared before the Honorable Judge Susan D. Wigenton, and entered a guilty plea to Count(s) two (2) and five (5) of the Indictment on September 15th, 2010. Count two (2) of the Indictment alleged that from January, 2005, through November, 2009, in the District of New Jersey and elsewhere, Mr. SHAPIRO, by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchange, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section §240.10b-5, in connection with the purchase and sale of securities by (I) employing devices, schemes, and artifices to defraud members of the investing public; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and a course of business which operated and would operate as a fraud and deceit upon Capitol investors, in violation of Title 15, United States Code, Sections §§78j(b) and 78ff(a), and Title 17, Code of Federal Regulations,

Section 240.10b-5. **[D.E.35] and [D.E.56]**

    Count five (5) of the Indictment charged Mr. SHAPIRO with knowingly engaging or attempting to engage in monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000 dollars, such property having been derived from specified unlawful activity, that is, securities fraud and wire fraud, in violation of Title 15, United States Code, Section §78j(b) and 78ff(a), Title 17, Code of Federal Regulations, Section §240.10b-5, and Title 18, United States Code, Section §1343, all in violation of Title 18, United States Code, Section §371, and Title 18, United States Code, Section §1957. **[D.E.14]; [D.E. 56]**

    At the time of the change of plea, Mr. SHAPIRO executed a plea agreement whereby Mr. SHAPIRO agreed that pursuant to USSG, Section §2B1.1(a), the base offense level was seven (7). Moreover, pursuant to the plea agreement, the loss amount that would be imputed to Mr. SHAPIRO pursuant to U.S.S.G. Section §2B1.1(b)(1)(M), was more than $50,000,000.00 dollars but less than $100,000,000.00 dollars, the latter which resulted in a twenty-four (24) level increase from the base offense level of seven (7). Additionally, as per the plea agreement and pursuant to U.S.S.G., Section §2B1.1(b)(2)(B), the number of victims involved in Mr. SHAPIRO's case was estimated between fifty (50) or more, but less than two-hundred and fifty (250), the latter which yielded a four (4) level increase from the base offense level. **[D.E.35]**

    The plea agreement likewise indicated Mr. SHAPIRO would agree to an additional two (2) level increase from the base offense level pursuant to U.S.S.G., Section §3B1.1(a), based upon Mr. SHAPIRO's leadership role in a conspiracy involving less than five (5) participants. **[D.E. 35]** Along that same vein, as per the plea agreement, the sentencing guideline applicable to the charge under

Title 18, United States Code, Section §1957, was contained in Count five (5) of the Indictment, is U.S.S.G., Section §2S1.1. **[D.E.35]** The latter Guideline instructs that the base offense level is the offense level for the underlying offense from which the laundered funds were derived, in this case, the securities fraud charged in Count two (2) of the Indictment. **[D.E.35]** Therefore, the base offense level for the charge brought in Count five (5) of the indictment is level thirty-seven (37). **[D.E.35]** Additionally, because the conviction is under Title 18, United States Code, Section §1957, the specific offense characteristic results in an increase of one (1) level. **[D.E.35]** Accordingly, the Sentencing Guidelines offense level applicable to the charge contained in Count two (2) of the Indictment is 38. **[D.E.35]**

Notwithstanding the aforementioned, according to the plea agreement, pursuant to U.S.S.G., Sections §§3D1.1 and 3D1.2©, Counts two (2) and five (5) of the Indictment constitute a single group. **[D.E.35]** And, pursuant to U.S.S.G. Section §3D1.3(a), the offense level applicable to this group is the offense level determined in accordance with Chapter Two (2) and Parts A, B, and C, of Chapter Three (3), for the most serious of the counts comprising the Group, i.e. the highest offense level of the counts in the Group. **[D.E.35]** Hence, the Guidelines offense level pursuant to the plea agreement was level thirty-eight (38). **[D.E.35]**

Also, as per the plea agreement, the government agreed to a downward adjustment of two (2) levels for acceptance of responsibility pursuant to U.S.S.G. Section §3E1.1(a). **[D.E.35]** Moreover, pursuant to the plea agreement, Mr. SHAPIRO qualified for an additional one (1) level decrease pursuant to U.S.S.G. Section §3E1.1(b). **[D.E.35]** As such, pursuant to the plea agreement, Mr. SHAPIRO's combined offense level was thirty-five (35). **[D.E.35]**

Finally, the plea agreement likewise incorporated an appeal waiver, however, said appeal waiver would only be effective in the event Mr. SHAPIRO was sentenced to a Sentencing Guidelines level of thirty-five (35) or less. **[D.E.35]** Hence in lieu of the fact Mr. SHAPIRO was sentenced to a level 37, the appeal waiver contained in the plea agreement became moot. **[D.E.35]**

Mr. SHAPIRO was sentenced on June 7th, 2011. Mr. SHAPIRO subsequently timely filed a Notice of Appeal on June 14, 2011. Thereafter, Mr. SHAPIRO's conviction was affirmed by the Third Circuit Court of Appeals on November 30, 2013. Mr. SHAPIRO did not seek review of his conviction with the United Sates Supreme Court via a Petition for Writ of Certiorari.

## II.  **JURISDICTION:**

A prisoner incarcerated by Order of a Federal Court has one (1) year to attack the Constitutionality of his sentence pursuant to Title 28, United States Code, Section 2255, which provides the limitations period for filing a Section 2255 Petition shall run from the latest of:

**(1) the date on which the judgment of conviction becomes final;**

**(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;**

**(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or**

**(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.**

Based upon the applicable Supreme Court case law, Mr. SHAPIRO has one (1) year, plus ninety (90) days from the date his conviction became final, to seek review of his sentence and conviction via Title 28, United States Code, Section 2255. *See* Clay v. United States of America, 537

U.S. 522, 525, 123 S.Ct. 1072, 155 L.Ed.2d (2003)(The <u>Clay</u> court held that after a conviction is affirmed by the appellate court, a defendant has ninety (90) days to seek a writ of certiorari.). Mr. SHAPIRO's conviction, thus, became final upon the expiration of the ninety (90) days—the time during which he could have pursued a writ of certiorari. Mr. SHAPIRO's Section 2255 Petition is therefore timely.

This Court likewise has jurisdiction to entertain, rule on the merits, and grant relief under Title 28 U.S.C. § 2255 and the principles of <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984).; <u>United States v. Bruce</u>, 89 F.3d 886 (D.C. Cir. 1996); <u>United States v. Martin</u>, 965 F.2d 839, 842-43 (10th Cir. 1992); and <u>United States v. Shorter</u>, 54 F.3d 1248, 1252-53 (7th Cir.), *cert. denied*, 116 S.Ct. 250 (1995).

## III. **STATEMENT AS TO WAIVER, CAUSE, AND PREJUDICE:**

Mr. SHAPIRO did not raise Claim Number One (1) on direct appeal because the facts set forth in the instant Section §2255 were not known to Mr. SHAPIRO until after his appeal was final, notwithstanding his sentencing and appellate counsel's due diligence, and therefore could not be part of the record for direct appeal."Cause" is therefore established for Mr. SHAPIRO's failure to raise claim one (1) set forth herein prior to this motion. *See* <u>Ciak v. United States</u>, 59 F.3d 296, 303-304 (2nd Cir. 1995); <u>Bond v. United States</u>, 1 F.3d 631 (7th Cir. 1994); <u>Stoia v. United States</u>, 22 F.3d 766 (7th Cir. 1994) (prisoner's failure to raise ineffective assistance of counsel claim on direct appeal will result in forfeiture of right to bring § 2255 motion only when claim is based entirely on trial record); <u>English v. United States</u>, 42 F.3d 473, 481 (9th Cir. 1994)(holding that Section 2255 claims are waived for failure to raise them on direct appeal only if (1) a specific procedural rule required the defendant to raise the issues on direct appeal or (2) the failure to raise the issues was a deliberate

bypass of direct review).

Cause exists for the failure of Mr. SHAPIRO to raise the instant claim of a material Brady violation, which rendered his guilty plea unknowing and involuntary, in his direct appeal because the record was sufficient to raise the claims, as Mr. SHAPIRO was not yet aware of the Brady violations set forth herein. *See* United States v. Hardamon, 188 F.3d 843 (7th Cir. 1999); United States v. Galloway, 56 F.3d 1239, 1240-43 (10th Cir. 1995) (en banc); United States v. Tunstall, 17 F.3d 245, 246 [4] (8th Cir. 1994).

Mr. SHAPIRO has properly pleaded "prejudice" by pleading the "fundamental defect" in his sentence, as set forth herein. *See* Ward v. United States, 995 F.2d 1317, 1321 (6th Cir. 1993). "Prejudice" to Mr. SHAPIRO, within the meaning of United States v. Frady, 456 U.S. 152, (1982), as construed by other District Courts, such as United States v. De La Fuente, 8 F.3d 1333, 1336-37 (9th Cir. 1993) is established by the fact that absent relief by this Court, Mr. SHAPIRO's sentence is in violation of the Constitution and laws of the United States. Id. *See also* Isabel v. United States, 980 F.2d 60, 64 (1st Cir. 1992) ("prejudice" established, for purpose of "procedural bypass question" where movant's "sentencing range would be reduced" if successful on claim).

Based on the foregoing, and the absence of any knowing and intelligent waiver by Mr. SHAPIRO of his right to bring the instant Section 2255 petition, this Court is not precluded by the "cause and prejudice" principle from entertaining, ruling on the merits, and granting the relief requested herein.

## IV. **REQUEST FOR EVIDENTIARY HEARING:**

Pursuant to Rule 5 of the Rules Governing Section 2255 proceedings, Mr. SHAPIRO respectfully requests this Honorable Court to **ORDER** an evidentiary hearing where Mr. SHAPIRO

will be able to proffer additional evidence and testimony in support of the instant Section 2255

Petition via: (A) his own testimony; (B) the testimony of attorney(s) Guy Lewis, Michael Tein, Maria

Elena Pérez, Gary Freedman, Andrea Rigali, Mark Levinson, Assistant United States Attorney(s)

Jacob Elberg, Justin Arnold, and lay witness(s) Patrick Franklin, Robert Kallman, attorney Paula

Colbath, Craig T. Currie, and Fanny Gallo ; © additional evidence; and (D) legal argument to be

presented during the course of the requested hearing.

## V. **MOTION FOR APPOINTMENT OF COUNSEL:**

Pursuant to Rule 6© and Rule 8© of the Rules Governing Section 2255 Proceedings, Mr.

SHAPIRO respectfully requests that counsel be appointed for discovery and for the requested

evidentiary hearing. Mr. SHAPIRO is indigent and has been indigent since April, 2010.

Furthermore, at this time Mr. SHAPIRO's family do not possess the financial resources to pay for

counsel to represent Mr. SHAPIRO, who has been unemployed since just before his incarceration

and was likewise stripped of all his assets which he voluntarily surrendered to the involuntary

bankruptcy trustee assigned to Mr. SHAPIRO's case–Mr. Gary Freedman, Esq. *See* United States

v. Leopard, 170 F.3d 1013, 1015 (10th Cir. 1999) ("if an evidentiary hearing is required, the judge

shall appoint counsel for a movant who qualifies for the appointment of such counsel under Title 18,

United States Code, Section 3006Ab.")

## VI. **MOTION FOR DISCOVERY:**

Pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings, Mr. SHAPIRO

respectfully requests this Court to invoke the processes of discovery. More specifically, Mr.

SHAPIRO respectfully requests this Honorable Court to **ORDER** that attorney(s) Guy Lewis,

Michael Tein, Marc Levinson, Jacob Elberg, Justin Arnold, Craig T. Currie, Fanny Gallo, Patrick Franklin, and the relevant case agents, to allow themselves to be deposed. The evidence developed through the foregoing depositions will materially support the allegations of Mr. SHAPIRO, and the identified Brady violations which are the subject of the instant motion, and are likewise the basis for Mr. SHAPIRO's request to withdraw his guilty plea.

It should be noted that Rule 6(a) of the Rules Governing Section 2255 proceedings provides for discovery under either Federal Rules of Civil Procedure 26-37 or under Federal Rule of Criminal Procedure 16. *See* J. Liebman and R. Hertz, Federal Habeas Corpus Practice and Procedure, § 41.6 [2-3] (3 Ed. 1998). In this respect, the Rules Governing Section 2255 Proceedings are distinct from the Rules Governing Section 2254 Proceedings because they allow additional discovery devices. *Id.*

The Supreme Court's most recent review of "discovery" in habeas corpus proceedings was in Bracy v. Gramley, 520 U.S. 899, 117 S. Ct, 1793, 138 L.Ed.2d 97 (1997). In Bracy v. Gramley, the Supreme Court vacated a District Court and Court of Appeals denial of discovery in habeas corpus, 28 U.S.C. § 2254. The Supreme Court pointed out that Rule 6 of the Rules Governing 2254 Cases, prescribing discovery procedures in federal habeas corpus cases, is meant to be consistent with Harris v. Nelson, 394 U.S. 286, 22 L.Ed.2d 281, 89 S.Ct. 1082 (1969), in which it was stated that where specific allegations before a federal court show reason to believe that a petitioner for federal habeas corpus relief may, if the facts are fully developed, be able to demonstrate entitlement to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry. Bracy v. Gramley, 520 U.S. at 909.

Based upon the unique facts of Mr. SHAPIRO's case, and the applicable Supreme Court and District Court precedent on the issue of discovery in Section 2255 petitions, Mr. SHAPIRO

respectfully requests this Honorable Court to allow Mr. SHAPIRO's counsel to question the referenced parties in connection with the allegations and facts set forth herein. Additionally, Mr. SHAPIRO proffers to this Honorable Court that the requested depositions will further substantiate the allegations set forth in the instant Section § 2255 Petition.

# VII. STATEMENT OF THE FACTS:

## A. *CAPITOL INVESTMENTS*

Capitol Investments (hereinafter "Capitol") was engaged in the wholesale grocery distribution business, and through Mr. SHAPIRO, raised monies from individual lenders in order to fund its business operations. Capitol–both directly and indirectly through third-party unregistered brokers such as Sydney Jack Williams, brought lenders to Capitol and in exchange received financial commissions. The latter third-party, unregistered brokers described Capitol's business to potential investors as follows:

1. Capitol would find interested buyers of grocery and other products, such as hair care goods, alcohol, baby food, and glass products, to name but a few examples.

2. Capitol would subsequently find a distributor that was offering the above-referenced types of goods for sale, such as Kraft, Campbell, and others.

3. Capitol would operate as the broker in the purchase and resale transactions and would generate profit by way of obtaining a commission based upon the difference between the purchase price and the resale price of the grocery and other products it sold.

4. On average, the standard turn-around time for the purchase and resale of the diverted products and goods was typically forty-two (42) days.

5. Capitol's lenders would thereafter receive a set interest rate on the funds said lenders advanced to Capitol for the purchase of the goods Capitol re-sold for a profit.

Currie's business operations were run much like Capitol's in that Currie would obtain short-term

financing from individual lenders, purchase goods and products, and then re-sell said goods and products to customers from profit. Currie also operated another business that specialized in the importation of shipping containers of glass and mirror products from China, titled China Glass, Inc. (hereinafter "China Glass"). Currie operated CraigCo and China Glass from the state of New Jersey.

Just before 2002, Capitol's business plan changed so that it not only bought and sold diverted grocery goods and other products, but also started financing Currie's business entities–including CraigCo and China Glass–and in exchange, Capitol received a percentage of the profits generated by Currie's business entities. Thereafter, in or about mid-2005, Capitol commenced conducting less of its own wholesale purchase and re-sale of grocery and other diverted goods and instead began using the monies it obtained from Capitol's lenders to fund Currie and his business entities via short-term financing that was to be utilized by Currie to buy and sell diverted goods. Pursuant to Mr. SHAPIRO's agreement with Currie, Capitol was to receive 12% of any and all profits generated by Currie's business entities.

### B. THE COMMENCEMENT OF MR. SHAPIRO'S RELATIONSHIP WITH LEGAL COUNSEL–THE LAW FIRM OF SHOOK, HARDY, AND BACON, IN CONNECTION WITH CAPITOL INVESTMENTS BUSINESS ACTIVITIES

Mr. SHAPIRO was introduced to the Law Firm of Shook, Hardy, and Bacon, in or about January 6, 2003, via Mr. SHAPIRO's life-long, childhood friend since the age of six (6), and attorney, Mr. Marc Levinson, the latter whom was actually employed by the law firm of Shook, Hardy, and Bacon. At the time Mr. SHAPIRO was brought in as a client of the Law Firm of Shook, Hardy and Bacon by attorney Marc Levinson, it was for the purposes of assisting Mr. SHAPIRO to acquire an interest in a sports agency by the name of Axcess Sports and Entertainment, which was owned and operated

by an individual known as Michael Huyghue.

However, in May, 2005, Shook, Hardy and Bacon attorney(s) Marc Levinson, Steve Neclario, and others additionally became the attorneys primarily responsible for conducting and advising Capitol Investments and Mr. SHAPIRO regarding all of Mr. SHAPIRO's business entities–including, but not limited to, Capitol Investment's wholesale grocery distribution business affairs. In fact, on May 26, 2005, Shook, Hardy and Bacon attorney Marc Levinson broadcasted the firm's unequivocal representation of Capitol in a letter on Shook, Hardy and Bacon letterhead which stated: "To Whom It May Concern: I represent Nevin Shapiro with regard to Capitol Investments USA, Inc. This letter verifies that Nevin Shapiro is the owner of Capitol Investments USA, Inc., and has been since 1998. If you have any questions, please do not hesitate to call."

The May 26, 2005, letter from Shook, Hardy and Bacon, was signed by attorney Marc Levinson, who knew and had reason to know Mr. SHAPIRO was providing said correspondence to prospective lenders in order to solicit loans for Capitol's diverting business. Capitol also reflected Shook, Hardy and Bacon as its general counsel in its Executive Summary and Corporate Data Sheet which was also provided to Capitol's prospective lenders with the full knowledge and consent of Shook, Hardy and Bacon.

Shook, Hardy and Bacon soon became Capitol's *de facto* general counsel, and their legal services were expansive, all-encompassing, and included, but were not limited to: (1) negotiating and documenting loan transactions; (2) advising Capitol on interest rates charged by Capitol's lenders; (3) providing, drafting, and finalizing form promissary notes, employment and joint venture agreements; (4) advising on ways to circumvent Florida's usury laws; (5) advising on the presentation of Capitol's financial statements that were to be provided to Capitol's prospective

lenders; (6) advising on the organization of Capitol's books and records; (7) interviewing and hiring temporary accountants to assist Capitol in organizing and reconciling its books and records; (8) researching securities laws in order to advise Capitol on same; (9) referring Capitol to special counsel in relation to Capitol's compliance with securities laws and communicating with said securities counsel on Capitol's behalf in order to keep apprised of any and all legal undertakings that needed to be taken in order to make certain Capitol was in compliance with any and all securities laws; (10) communicating with Capitol's accountant regarding the status of Capitol's books, records, and any tax issues; (11) advising Capitol in relation to its business practices; (12) providing strategic advice to Capitol on litigation and criminal matters, all of which are evidenced by Shook, Hardy and Bacon's time sheets; and (13) referring Mr. SHAPIRO to a former partner of Shook, Hardy and Bacon–Mr. Guy Lewis–in order to assist Mr. SHAPIRO in his efforts to obtain the return of millions of dollars that were stolen from Capitol by Craig T. Currie, as well as assessing Mr. SHAPIRO's criminal exposure and likewise providing the Lewis and Tein law firm with documentation of Capitol's legal file and Capitol's historical business operations.

As Capitol's *de facto* legal counsel, Shook, Hardy and Bacon were fully aware, and participated in making representations to Capitol's lenders and future lenders, regarding Capitol's financial viability, and actually encouraged Mr. SHAPIRO to continue forward with Capitol, and went as far as advising Mr. SHAPIRO to seek out new lenders in order to keep Capitol afloat when Currie's default to Capitol created significant financial hardships for Capitol's "core business." As but one example, on August 14, 2006, Capitol's accountant, Roberto Torres, sent an email to Shook, Hardy and Bacon attorney Steven Neclario, who was supervising attorney Marc Levinson, which stated, in part:

"Several shareholders, and directors minutes have to be made and included in the books. Transfer of shares authorization for loans, etc.. For what ever reason Craig Dorne never updated the books. Suggest you review with Jgero to see what she can advise is needed and can be done. Some of the minutes were to be executed back in 2004, 2005 and early 2006. Also please review the inventory book of Nevin to see what is needed (we delivered this several months ago), to see if other legal entities, included in the book are in the same situation. In my opinion the corporation needs to authorize Nevin to sign for loans (several millions) does it make any difference if there is a shareholders agreement to get the loan and use the company shares as collateral? Application of the funds obtained from the loans is this restricted? Can any shareholder wire monies to his personal accountant?

...[H]ow is corporate liability established???Liability wise Does it make any difference how many shares $$$ you have in a corp???What type of Corp it is??? This (*sic*) are the questions that we need answers for and shareholders and directors minutes to support. I sincerely apologize for our lack of knowledge??Can you please help now?? I do not know that from the IRS and Florida Dept of State it makes a difference!!! I am not a corporate attorney but some experience tax wise tell me that we are not in compliance. If there is anything to gain by spending time and money to protect the corporate veil I surely want it to be your decision."

In response, Shook, Hardy and Bacon counsel responded: "ok We will advise." Marc Levinson's handwritten notes reflect that Capitol needed a corporate resolution in order for Mr. SHAPIRO to take out personal loans from Capitol as all lenders require it, yet Shook, Hardy and Bacon knew no corporate resolution was ever made authorizing Mr. SHAPIRO to take out millions of dollars of loans from Capitol, and Shook, Hardy and Bacon did nothing to rectify it notwithstanding they were Capitol's and Mr. SHAPIRO's legal counsel.

As explained below, Craig T. Currie defaulted on all of his loans to Capitol, and in January, 2005, Shook, Hardy and Bacon counsel commenced meeting with Mr. SHAPIRO and Capitol's accountant, Roberto Torres, regarding collection efforts against Currie. Unfortunately, by April,

2005, Mr. SHAPIRO began efforts to liquidate his assets, primarily his Riviera yacht and his two (2) properties in the Bahamas, and enlisted the help of Shook, Hardy and Bacon. Nevertheless, despite knowing that Capitol was in a dire financial condition due to Currie's default on his loans from Capitol, Shook, Hardy and Bacon, through Marc Levinson, negotiated a loan from David White through a Capitol broker, Sydney Jack Williams, Jr., in the amount of $1.2 million dollars in November, 2005, even through Marc Levinson knew and had reason to known the latter loan was being used to repay other maturing lenders loans.

Shook, Hardy and Bacon attorney Marc Levinson also drafted David White's promissory note, and the accompanying guarantee agreements. Attorney Marc Levinson thereafter sent the David White $1.2 million dollar Note and White Guarantee Agreements to Mr. SHAPIRO and instructed him to execute said loan documents and return same to Marc Levinson.

Through October, 2006, Shook, Hardy and Bacon continued to prepare Capitol's form promissary notes to use with Capitol's lenders, and they likewise continued to prepare employment agreements for same.

A more detailed account of Shook, Hardy and Bacon's conduct, including their ineffective legal assistance which was the direct and proximate cause of Capitol's financial failure, was actually the subject of a lawsuit filed by the involuntary bankruptcy trustee against Shook, Hardy and Bacon, on December 17, 2012, Case No. 12-48825CA10. And, as a result of the latter lawsuit, Shook, Hardy and Bacon reached a settlement with the Capitol estate in 2013, to the tune of $5 million dollars. This amount hardly represents the actual damages caused by Shook, Hardy and Bacon's ineffective legal assistance.

### C. *CRAIG T. CURRIE AND HIS BUSINESS ENTITIES DEFAULT ON THEIR LOANS FROM CAPITOL*

During the span of Capitol's relationship with Craig T. Currie and his business entities, Capitol funded Currie to the tune of $42,136,826.56 million dollars. However, by late 2003, Currie was having trouble keeping up with his payments to Capitol, as is evidenced by the scores of email correspondence sent to Currie by Mr. SHAPIRO's accountant, Roberto Torres. In fact, as is evidenced by Roberto Torres' own email to Currie, it was Roberto Torres who pushed Mr. SHAPIRO to continue to invest in Currie's business entities.

However, by June, 2006, Capitol was in full-blown financial crisis mode. And on June 1, 2006, Roberto Torres, Capitol's accountant, send electronic correspondence to Currie and copying Marc Levinson, which stated as follows:

> "It is most important to both of us (Craigco + Capitol) to have an enhanced version of the payback schedule. Nevin is under a tremendous amount of pressure from his investors and it is getting to the point what they no longer feel secure (because of all the extensions on the payment deadlines). If Nevin Capitol goes under Levinson will have to come after you + China Glass, Craigco, etc. We have to show them that we are doing something to secure the compliance with their payment. For 5 million they were asking to set up their accountant in our office, imagine if they were out 15 million (w/out collateral).
>
> ...[N]othing you can do now will ever place us back in the position we were back in November last year. We have lost out edge with our money guys, perhaps we can tap into yours, to cover this hole. The only advantage we have is that we are squeaky clean with the IRS, we filed all returns to 2005 and we have financials ytd 2006 (3-31-06). Nevin has paid his taxes and then some.
>
> ...[W'e have been very close to total collapse because of your delays, if your attorneys did not do the complete job required, if your accountant did not do the proper reporting, if you did not kept (*sic*) track of the chk list for the closing, that is all water under the bridge, what is a real fact is that we have no choice, we have to make every effort to be as close to you as possible, so that we are accurate in our assessments and our promises to our investors from now on. Our reply to J Will et al [Capitol

Lenders] is very short, payment for use for June are an additional 4 million."

By September, 2006, it became apparent to Shook, Hardy and Bacon that Capitol was in a

financial crisis and Craig T. Currie would not be repaying his outstanding loans to Capitol. In a

September 27, 2006, email with a subject "Crisis Management" to Mr. SHAPIRO and copying Marc

Levinson, Steve Neclario, Marc Levinson's supervising attorney, provided the following

observations:

> "Unfortunately, it appears that your long time business associate Craig Currie will
> not be able to meet his outstanding obligations to you. Although we hope that your
> skills might eventually turn that situation around, we all agree, for planning purposes,
> it is prudent to assume he will be in default; as we know your position with him is
> unsecured.
>
> In view of the amount involved, it is required that the current situation be treated as
> a crisis in the same manner, as for example you were selling a mass produced product
> which was found to be contaminated. I suggest you establish a crisis management
> team consisting of Marc, Jackie, and Roberto, and have them in constant
> communication as to the financial situation and what can be done to protect Capital
> (sic) and its shareholders. Most importantly, it will be critical of each of them to have
> all available information both as to what has happened in the past and what situations
> are coming. I will of course be available to assist them with particular questions and
> to give them the benefit of my experience.
>
> For what I observe, your effectiveness is being limited by advisors with insufficient
> information both as to what has happened in particular situations and what is coming
> along. At this point, a poor plan would be to think they can be managed by telling
> each what it is assumed they need to know for particular projects. You need people
> with all appropriate knowledge of the situation and ability to act promptly in your
> best interests. No one can afford to have repeated discussions about the same subject
> based on faulty information in a crisis. Let me know what you think."

**(See Exhibit "26").**

On October 16, 2006, Capitol's accountant, Roberto Torres, sent an email to Capitol's outside

accountant, Jackie Gero, and Shook, Hardy and Bacon counsel, Marc Levinson, notifying the latter

that Capitol was operating at a net loss:

> "Our accounts and notes receivables will be adjusted to reflect the loses (*sic*) of income from Craigco and the sales reduction in general. Capitol networth will be negative, I am still trying to come up with a forecast of how we are going to look by dec 31 2006. (f) Nevin's financial reports will also receive similar treatment because of the notes from Craigco (1m) and China Glass (1.8m). When we reconcile these accounts, and come up with a forecast of the Axcess shares sale (or not) and the sale of the boat, plus the pass thru from Capitol's k-1, Nevin's net worth will also be negative. Your comments will be appreciated."

Notwithstanding the fact Shook, Hardy and Bacon knew and should have known that Capitol was operating at a loss, they never advised Mr. SHAPIRO or Capitol to cease further borrowing from Capitol's lenders. Rather, Shook, Hardy and Bacon counsel Marc Levinson, advised Mr. SHAPIRO that he needed to continue borrowing funds to make sure Capitol could continue to service Capitol's debt to its current lenders.

Since Shook, Hardy and Bacon counsel knew well that Capitol was operating at a loss because of the outstanding Craig T. Currie loans, and that Capitol was using new lender funds to repay maturing lender's loans to stay afloat, Shook, Hardy and Bacon counsel became concerned about the legal implications to Mr. SHAPIRO and Capitol. And in November, 2006, according to Roberto Torres, Marc Levinson asked Mr. SHAPIRO at a meeting if Capitol was operating a Ponzi scheme which caused Marc Levinson to commission research by a Shook, Hardy and Bacon attorney, Mihai Vrasmasu, as to whether Capitol was violating the Securities and Exchange Act by engaging it the illegal sale of securities and criminal enforcement of the Federal and Florida securities laws. Shook, Hardy and Bacon counsel never provided Mr. SHAPIRO with a copy of the latter memo, which concluded that Capitol was in fact violating securities laws. And, Marc Levinson was pressed to admit the latter fact during the course of his Rule 2004 examination in 2011.

Rather, finally on January 11, 2007, Shook, Hardy and Bacon counsel Marc Levinson sent an email to Mr. SHAPIRO and his accountant, Alejandro Torres, which was an extremely terse version of the actual memo generated by Marc Levinson's paralegal regarding securities laws. However, attorney Marc Levinson concluded his January 11, 2007, email by stating that he wanted to consult with an attorney that specializes in securities laws.

In response to Marc Levinson's January 11, 2007, email, Roberto Torres understood Marc Levinson's January 11, 2007, email to mean that Capitol was not a "Ponzi" because Capitol was not selling shares of stock, but rather was obtaining money from lenders so it could therefore not be in violation of the Securities Act. Shook, Hardy and Bacon counsel Marc Levinson never rectified Roberto Torres' incorrect interpretation of the Securities Act, nor did Marc Levinson ever provide Roberto Torres or Mr. SHAPIRO with a copy of the Securities memorandum prepared by Shook, Hardy and Bacon paralegal Mihai Vrasmasu, the latter which could have clarified what conduct would be considered violations of the Securities Act, and the criminal ramifications associated with said violations of same.

In the backdrop of Capitol's crisis mode as a result of the monies which Craig T. Currie had effectively stolen from Capitol, combined with Shook, Hardy and Bacon's failure to address Craig T. Currie's default on the loans extended to same by Capitol, in addition to the new concern that Capitol and Mr. SHAPIRO had criminal exposure as a result of potential securities laws violations, Shook, Hardy and Bacon counsel Marc Levinson instructed Mr. SHAPIRO to confer with former Shook, Hardy and Bacon **criminal counsel–Mr. Guy Lewis and his partner, Michael Tein**.

D.     *THE COMMENCEMENT OF MR. SHAPIRO'S ATTORNEY-CLIENT RELATIONSHIP WITH SECOND LEGAL COUNSEL–THE LAW FIRM OF LEWIS AND TEIN P.L.*

a.     *Lewis and Tein are Retained by Mr. SHAPIRO to Obtain the Return of the Monies Stolen by Craig T. Currie from Mr. SHAPIRO and his Investors for "Real" Grey Market Diversion Business Deals that Mr. SHAPIRO was Funding*

In February, 2007, Mr. SHAPIRO's and Capitol Investment's counsel, Mr. Marc Levinson, from the law firm of Shook, Hardy and Bacon, referred Mr. SHAPIRO to attorney(s) Guy Lewis and Michael Tein. The purpose of the introduction and referral for legal representation was to have the Lewis and Tein firm oversee and handle Mr. SHAPIRO's corporate, civil, and potential criminal, legal matters created by two (2) of Mr. SHAPIRO's most troublesome business associates–Craig T. Currie and Robert Kallman--and to additionally have Mr. Craig T. Currie criminally charged for fraud and theft of millions of dollars from Capitol which belonged to Mr. SHAPIRO's lenders.

During the February 26, 2007, informational/investigatory client meeting at the Lewis and Tein firm offices, Mr. SHAPIRO was in attendance along with attorneys Marc Levinson, Mike Tein, and Guy Lewis. At the latter introductory meeting Mr. SHAPIRO specifically discussed with all parties present, the details concerning the conduct of Craig T. Currie, the latter's theft of Captiol's investor's monies, Mr. SHAPIRO's potential criminal liabilities, and the proposal of moving forward with a civil lawsuit and criminal prosecution of Craig T. Currie, as a result of the fraud perpetrated by same upon Capitol Investments, USA, Inc., Mr. SHAPIRO, and his lenders.

On February 28th, 2007, the Lewis and Tein law firm entered into their first engagement agreement with me for representation of Mr. SHAPIRO, and Capitol Investments, USA, Inc., as described herein. Furthermore, Mr. SHAPIRO wanted the Lewis and Tein firm to investigate any

and all supposed criminal investigations that may have been initiated against Mr. SHAPIRO based upon supposed "complaints" to the FBI which were purportedly initiated by Robert Kallman, a Capitol Investments, USA, Inc., business associate and/or lender. According to the information disseminated by Craig T. Currie, which was never actually substantiated, Robert Kallman contacted the FBI field office in Newark, New Jersey, in order to initiate a complaint against Mr. SHAPIRO alleging Mr. SHAPIRO was using Capitol Investments, Inc., to engage in fraud and/or a Ponzi scheme. **(See Exhibit "20").**

On March 5th, 2007, the Lewis and Tein Law Firm received $25,000.00 dollars from the Capitol Investments, USA, Inc. bank account, check number 4733, as the initial retainer and financial consideration for Mr. SHAPIRO's legal representation by attorneys Guy Lewis, Michael Tein, and Lewis and Tein PL.

More importantly, at the time attorneys Guy Lewis and Michael Tein were introduced to Mr. SHAPIRO, they held themselves out as a high-ranking, former United States Attorney and Assistant United States attorney, respectively, who were extremely "connected" within the United States Department of Justice, and who likewise had the ability to deliver "unique results" such as the ability to obtain immunity from federal prosecution and the ability to have someone who defrauded Mr. SHAPIRO out of a significant amount of money (approximately $50 million)—i.e. Craig T. Currie-- investigated, charged, and arrested.

In fact, during the course of Guy Lewis Rule 2004 examination taken on May 11, 2011, Guy Lewis testified that one (1) of the primary reasons the Lewis and Tein firm was retained by Mr. SHAPIRO and Capitol was to manage and oversee the "crisis" situation created by Craig Currie's failure to re-pay the millions of dollars he owed Capitol Investments. **(See Exhibit "28" at P. 15;**

**P. 25; ).** Consistent with the latter goal, Guy Lewis testified that he was also supposed to monitor the "situation" with Robert Kallman and the alleged investigation commenced by same. **(See Exhibit "28" at P. 30).** Along that same vein, on May 11, 2011, Guy Lewis testified that Mr. SHAPIRO constantly discussed with the Lewis and Tein firm the damage that Craig T. Currie was creating by his failure to return the monies he owed Capitol and its lenders, and stated Mr. SHAPIRO was: "...[v]ery, very, upset about that." **(See Exhibit "28" at P.46).**

Consistent with the responsibilities undertaken by the Lewis and Tein firm on behalf of Mr. SHAPIRO and Capitol Investments, in early May, 2007, Mr. SHAPIRO's private investigator, Patrick Franklin, with the knowledge and consent of attorneys Guy Lewis and Michael Tein, obtained a Sworn Affidavit from Mr. Craig Currie wherein the later stated that Robert Kallman was contacting him on a daily basis. During the latter calls, Kallman requested Craig Currie to collude with him (Robert Kallman) to "get Nevin" by falsely alleging that Mr. SHAPIRO and Craig Currie "conspired" to "rip Kallman off." **(See Exhibit "22"; Exhibit "23" and Exhibit "24").** Furthermore, Craig Currie also stated that at no time was there ever a conspiracy between himself and Mr. SHAPIRO to "Rip Kallman off." **(See Exhibit "22"; Exhibit "23" and Exhibit "24").** Craig Currie also stated Robert Kallman was "continually threatening to go to the District Attorney's Office and offered to help Craig Currie if he (Craig Currie) admitted that he conspired with Nevin to "rip him off." **(See Exhibit "22"; Exhibit "23" and Exhibit "24").**

On May 10, 2007, Mr. SHAPIRO's investigator, Patrick Franklin, obtained the Sworn Affidavit of Craig Currie's wife, Fanny Gallo, who stated much of the same as Craig Currie. In particular, Fanny Gallo stated that since December, 2006, Robert Kallman had showed up at her house unannounced at least four (4) times, and attempted to engage her in conversations about her husband,

Craig Currie. **(See Exhibit "23" and Exhibit "24").** Fanny Gallo additionally stated that for the last eight (8) weeks Robert Kallman had been contacting her cellular telephone on a daily basis, amounting to no less than ten (10) calls in a twenty-four (24) hour period. **(See Exhibit "23" and Exhibit "24").** Fanny Gallo also stated that Robert Kallman was attempting to get her to admit that Craig Currie and Nevin Shapiro ripped him (Robert Kallman) off, by stealing money from him. **(See Exhibit "23" and Exhibit "24").** Fanny Gallo also reported that Robert Kallman threatened to go to the prosecutor's office and that if she (Fanny Gallo) did not want to go to jail, he would help her if she (Fanny Gallo) would admit that her husband, Craig Currie, and Nevin Shapiro "ripped him off." **(See Exhibit "23" and Exhibit "24").**

Fanny Gallo further stated that Robert Kallman requested her to sign an affidavit alleging that she (Fanny Gallo) overheard business conversations between Craig Currie and Nevin Shapiro, and to likewise admit that she (Fanny Gallo) knew that Mr. SHAPIRO and Craig Currie had off-shore accounts. In closing, Fanny Gallo indicated that she had no knowledge of either Mr. SHAPIRO or her Craig Currie conspiring to "rip him off. **(See Exhibit "23" and Exhibit "24").**

> *b.* *Guy Lewis Receives Correspondence From Counsel for Craig T. Currie*
> *on May 8, 2008, Confirming Craig Currie had Spoken to the Assistant*
> *United States Attorney in New Jersey and Alleged Mr. SHAPIRO and*
> *Capitol had "Stolen" Monies from Craig Currie and Robert Kallman*

On May 8, 2008, Guy Lewis was forwarded correspondence by Mr. SHAPIRO's other attorneys from Shook, Hardy and Bacon, which was sent to the latter by counsel for Craig Currie, Mr. Paul Bergrin. **(See Exhibit "").** In no uncertain terms, counsel fro Craig Currie maintained he had reviewed information "…[p]rovided by *federal agents involved in the criminal investigation and review of other documentary evidence, I implore you to consider advising your client to settle this*

*matter for monies due and owing to Craig Currie and other parties."* **(See Exhibit "20")**. Counsel

for Craig Currie also stated Mr. SHAPIRO and his employees, Alex and Roberto Torres, used Craig

Curries corporations to fraudulently receive monies, and similarly purportedly stole $1.8 million

dollars from China Glass bank accounts. **(See Exhibit "20")**. Paul Bergrin went on to state he had:

"...[a]ffirmative proof and there is a blatant paper trail that Mr. Shapiro has *engaged in fraud* by

opening unauthorized bank accounts under the name of corporations owned and operated by Currie.

Moreover, Shapiro was the sole signatory on these accounts and they were opened using Currie's

tax identification number." **(See Exhibit "20")**.

Counsel for Craig Currie went on to state: "The records in my possession clearly evidence over

$500,000 embezzled by Shapiro from Craigco, Inc.. Furthermore, my investigative team is in the

process of contacting and interviewing numerous individuals including but not limited to investors

of Shapiro such as Jack and Lori Williams, as well as others, in our pursuit of justice and the

vigorous prosecution to recoup monies due and owing. We also intend on investigating whether

Shapiro's commission of tax fraud in allocating over three (3) million dollars in 'write-off' loans

affected Currie or Kallman adversely." **(See Exhibit "20")**.

In response, counsel for Mr. SHAPIRO, Mr. Guy Lewis, sent counsel for Craig Currie responsive

correspondence on May 15, 2008, wherein he accused Craig Currie's attorney of being a "..*[f]elon,*

*money-launderer, and pimp and have conspired with at least one of your former clients to solicit*

*prostitution and commit numerous felonies. Apparently, instead of inventing groundless and*

*defamatory fantasies and making illegal demands on an INNOCENT businessman, you would*

*do well to focus your energy and that of your putative 'investigative team' on your multi-count*

*felony trial set for this September."* **(See Exhibit "29")**.

In closing, Guy Lewis went on to state: "For the above reasons, your false, unethical, extortionate and illegal demands are rejected. Be advised that a copy of your letter is being transmitted to the Manhattan District Attorney." **(See Exhibit "29").**

> c. *March, 2010–The Month Before Mr. SHAPIRO is Instructed to Self-Surrender to New Jersey Federal Authorities by Guy Lewis and Michael Tein the Sworn Statement of Fanny Gallo is Taken by Mr. SHAPIRO's Counsel–Mr. Guy Lewis and Mr. Michael Tein*

Exactly less than one (1) month before Mr. SHAPIRO was told to self-surrender to authorities, on March 11, 2010, Lewis and Tein took the formal statement of Craig T. Currie's wife, Fanny Gallo. **(See Exhibit "32").** Fanny Gallo's March 11, 2010, sworn statement was consistent with the Sworn Affidavit she provided to counsel for Mr. SHAPIRO on May 10, 2007. That is, Fanny Gallo again confirmed that Mr. SHAPIRO never asked her to commit any fraud. **(See Exhibit "32" at P. 6).** Fanny Gallo additionally testified that Mr. SHAPIRO funded her husband's grey market diversion deals, and that Craig Currie failed to pay back Mr. SHAPIRO. **(See Exhibit "32 at P. 6-9).** Fanny Gallo also confirmed that Robert Kallman and Craig Currie together went "behind Nevin's back" and did deals together, and that Craig T. Currie actually instructed Robert Kallman to deposit money in Fanny Gallo's account so that they could conduct business behind Mr. SHAPIRO's back. **(See Exhibit "32" at P. 14-16).** Fanny Gallo also testified that Craig Currie and Robert Kallman were "conspiring" against Mr. SHAPIRO, and that Craig Currie actually physically threatened her, including threatening to kill her. **(See Exhibit "32" at P. 16-17).**

> d. *Mr. SHAPIRO is Criminally Charged by Federal Authorities in New Jersey via Criminal Complaint*

On April 20, 2010, Mr. SHAPIRO self-surrendered to New Jersey Federal authorities and was charged via criminal complaint with two (1) counts–Count I, Securities Fraud, in violation of Title

15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2; and Count II-Money Laundering, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2, that were of a value greater than $10,000.00 dollars, and that were derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

The criminal complaint maintained that from January, 2005, through on or about November 30, 2009, Mr. SHAPIRO raised more than $880 million dollars from at least 60 investors, purportedly to finance Capitol, his wholesale grocery distribution business. However, the criminal complaint goes on to state that Mr. SHAPIRO and Capitol had virtually no legitimate business during this time. Rather, it was alleged that Mr. SHAPIRO was using new investor money to fund principal and interest payments to existing investors, in a Ponzi scheme fashion, and likewise misappropriated tens of millions of dollars for personal expenses.

The criminal complaint likewise alleged that on November 30, 2009, certain Capitol investors of Mr. SHAPIRO and Capitol, had failed to make required principal and interest payments filed an involuntary bankruptcy petition against Capitol. It was further alleged that as of the date of the complaint Mr. SHAPIRO and Capitol owed more than $80 million dollars to investors. The criminal complaint also maintained that from 2005 through in or about October, 2006, an investor, Robert Kallman, invested approximately $5.4 million dollars with Mr. SHAPIRO and Capitol Investments through Robert Kallman's New-Jersey based company. Moreover, it was alleged that on January 5, 2006, Mr. SHAPIRO placed a telephone call to Robert Kallman in order to solicit the latter to invest monies in Capitol which was to be used to fund Capitol's wholesale grocery business. Based upon

the latter representations Robert Kallman wired a total of $326,725.00 dollars. Thereafter, on January 10, 2006, Mr. SHAPIRO wired $202,000.00 dollars back to Robert Kallman.

The next day, April 21, 2010, attorney Michael Tein, from Lewis and Tein PL, filed a Notice of Appearance on behalf of Mr. SHAPIRO. **[D.E. #5].** Attorney Michael Tein waived any and all preliminary examinations or hearings, and agreed to the forfeiture of property. **[D.E.6 through 8].**

### e.    *Mr. SHAPIRO's Counsel Requests Brady Evidence*

On May 11, 2010, attorney Maria Elena Pérez, Esq. entered an appearance on behalf of Mr. SHAPIRO. And, during the months to follow, counsel for Mr. SHAPIRO and the Government attempted to come to an agreement regarding the loss amount associated with Mr. SHAPIRO's case, as well as multiple sentencing enhancements requested by the Government. The parties were not able to come to an agreement, and on July 14, 2010, the Government formally indicted Mr. SHAPIRO. **[D.E. 12].** On April 6, 2011, Mr. SHAPIRO requested Assistant United States Attorney Jacob Elberg to produce any and all Brady evidence in Mr. SHAPIRO's case, including any evidence suggesting that a third party who was not Mr. SHAPIRO was stealing Capitol Investment's investor funds from Mr. SHAPIRO without Mr. SHAPIRO's knowledge. **(See Exhibit "1").** In response, Assistant United States Attorney Jacob Elberg consistently indicated that he was aware of the government's Brady obligations, and had likewise turned over **everything** that would be necessary under their Brady obligations. **(See Exhibit "4").**

On May 26, 2011, at 5:06 p.m., in an email from AUSA Jacob Elberg, the latter stated : "...[w]ith regard to Mr. Currie, what I have told you repeatedly, is that we understand our Brady obligations, have always acted consistent with them, and always will." On June 2, 2011, the government advised counsel for Mr. SHAPIRO that they were going to allow counsel to NOW review and read

documents consistent with what counsel for Mr. SHAPIRO requested regarding Mr. Craig T. Currie and others, but would not release copies of the documents, or allow counsel for Mr. SHAPIRO to retain a copy to review with Mr. SHAPIRO. **(See Exhibit "2"; Exhibit "3" and Exhibit "4").**

In another subsequent response to a follow-up conversation counsel for Mr. SHAPIRO had with the government regarding various sentencing arguments to be proffered, on June 2, 2011, Assistant United States Attorney Jacob Elberg stated: "The government does not contest the fact that, at some point in time prior to August, 2007, Nevin Shapiro did have at least some legitimate business through Capitol Investments USA, Inc.....[T]he Government takes no position as to whether or not Craig Currie, at some point prior to August, 2007, engaged in misconduct which resulted in Nevin Shapiro losing money." **(See Exhibit "5").**

> ### f. *Mr. SHAPIRO Learns of the Government's Brady Violation in June, 2013*

In June, 2013, on the Monday, following Father's Day, and during the course of assisting the Bankruptcy trustee, counsel for Mr. SHAPIRO received documents from counsel for the Trustee, Ms. Andrea Rigali. According to Ms. Rigali, the documents which are the subject of the government's Brady violation as set forth herein, had been produced to the Trustee on June 28, 2012, by an attorney (Paula Colbath, Esq.) representing the alleged victim identified in the Criminal Complaint lodged against Mr. SHAPIRO on April 20, 2010–Mr. Robert Kallman. **(See Exhibit "6" through "21").** According to attorney Andrea Rigali, **Exhibit(s) "6" through Exhibit "21"** had all been produced to Assistant United States Attorney Jacob Elberg, since at least 2007, through 2009, and as reported to her by counsel for Robert Kallman. Furthermore, according to attorney Andrea Rigali, Paula Colbath, counsel for Robert Kallman, had subsequently produced **Exhibit(s) "6" through "Exhibit "21"** to the bankruptcy trustee in Mr. SHAPIRO's case in order to argue for

the return of a lesser amount of money to the Trustee in Mr. SHAPIRO's case, as Robert Kallman was indeed part of the "clawback" of Capitol's assets, which needed to be returned forthwith to Capitol's estate.

## VIII. MEMORANDUM OF LAW:

**Issue I.**: *The Government's **Brady** Violation Resulting in Prejudice to Mr. SHAPIRO*

In the context of determining whether a prosecutor withheld exculpatory evidence in violation of Brady, "exculpatory evidence" is that which would tend to show freedom from fault, guilt or blame. A new trial is warranted under Brady when the defendant shows (1) government suppression of (2) evidence favorable to defendant, and (3) that the evidence is material. *See* Moore v. Illinois, 408 U.S. 786, 794-95 (1972); United States of America v. Payne, 63 F.3d 1200, 1208 (2nd Cir. 1995).

The government has an affirmative duty to disclose exculpatory evidence known to it. Even absent a defense request for exculpatory information, it is not absolved of this obligation. United States of America v. Agurs, 427 U.S. 97, 108-110 (1976); United States of America v. Bagley, 473 U.S. 667, 682 (1985). The government does not have a duty to seek out this sort of evidence not in its possession or constructive possession. *See* United States of America v. Beaver, 524 F.2d 963,966 (5th Cir. 1975).

There is no distinction between exculpatory evidence and impeachment evidence for Brady purposes, and failure to disclose either may constitute a violation. *See* Bagley, 473 U.S. 667, 682 (1985). A necessary element of a Brady violation is the prosecution's suppression of evidence. The prosecutor's obligation is far-reaching, and it must manage its case meticulously. Failure to disclose evidence due to negligence, Giglio v. United States of America, 405 U.S. 150, 154 (1972),

("[W]hether the non-disclosure was a result of negligence or design, it is the responsibility of the prosecutor"), or because it simply was overlooked, United States of America v. Agurs, 427 U.S. 97, 110 (1976), ("If evidence highly probative of innocence is in his file, [the prosecutor] should be presumed to recognize its significance even if he has actually overlooked it"), are not adequate justifications for a prosecutor's failure to disclose favorable evidence. A prosecutor's good faith or lack of bad faith is irrelevant. Id.

The evidence subject to mandatory disclosure extends beyond the prosecutor's domain to include evidence known by all officers acting on behalf of the government. See Brady v. Maryland, 373 U.S. 83; 83 S.Ct. 1194 (1963); Kyles v. Whitely, 514 U.S. 419 , 115 S.Ct. 1555 (1995)."[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. The prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." Kyles v. Whitely, 514 U.S. 419 , 115 S.Ct. 1555 (1995); United States of America v. Payne, 63 F.3d 1200, 1208 (2nd Cir. 1995).

Brady requires communication between prosecutors and other governmental entities involved in the prosecution or investigation. There is no "serious doubt that procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." See Kyles v. Whitely, 514 U.S. 419, 115 S.Ct. 1555 (1995).

To settle for anything less than imposing a responsibility to disclose on the entire prosecutorial team would be unworkable and detrimental to our system of justice. The rationale for placing full responsibility upon the prosecution inheres in the prosecutor's role as attorney for the government,

which transcends that of an adversary. The prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win the case, but that justice shall be done." *See* Berger v. United States of America, 295 U.S. 78, 88 (1935).

Materiality is central to Brady analysis. Constitutional error results, and a new trial is warranted, only when the suppressed exculpatory evidence is "material." Brady v. Maryland, 373 U.S. 83; 83 S.Ct. 1194 (1963); United States of America v. Payne, 63 F.3d 1200, 1208 (2nd Cir. 1995). Undisclosed evidence is material only if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States of America v. Bagley, 473 U.S. 667, 682 (1985). "A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines the confidence in the outcome of the trial." Kyles v. Whitely, 514 U.S. 419 , 115 S.Ct. 1555 (1995).

A Brady violation is established by a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. United States of America v. Gambino, 59 F.3d 353, 364 (2nd Cir. 1995)("Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict; that is, newly discovered evidence must be of a sort that could, if believed, change the verdict."). Under the prejudice prong of a Brady claim, the issue in a case involving a guilty plea is whether there is a reasonable probability that but for the failure to disclose the Brady material, the Defendant would have refused to plead and would have gone to trial. *See* United States of America v. Nelson, 2013 WL 5778318 (D.D.C. 2013); Tollett v. Henderson, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed. 2d 235 (1973); United States of America v. Koumbairia, 501 Fed.Appx. 1,3 (D.C. Cir. 2013).

In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), the Supreme Court expressed a general resolve to ensure that justice is served. Specifically, in Brady, the Supreme Court explained that:"...[o]ur system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."

A defendant who is forced to make a choice about going to trial or pleading guilty unaware that the government has not disclosed evidence "which, if made available, would tend to exculpate him suffers unfair treatment unworthy of the bedrock ideal inscribed on the Justice Department walls. Id. Moreover, precluding a defendant from raising such a Brady claim after a guilty plea could create a risk too costly to the integrity of the system of justice to countenance—tempting a prosecutor to stray from that bedrock ideal and "deliberately withhold exculpatory information as part of an attempt to elicit guilty pleas. Sanchez v. United States of America, 50 F.3d at 1453 (9th Cir. 1995). If a prosecutor did so, that would "cast[ ] the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice[.]" Brady v. Maryland, 373 U.S. 83; 83 S.Ct. 1194 (1963).The standard applied to a Section §2255 motion grounded on a claim of the government's failure to disclose exculpatory evidence to the defendant is rooted in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963). Allowing a defendant to argue that his guilty plea was not voluntary and intelligent because it was made in the absence of withheld Brady material is sensible, because a defendant's decision whether to plead guilty is often heavily influenced by his appraisal of the prosecution's case; a waiver cannot be deemed intelligent and voluntary if entered without knowledge of material information withheld by the prosecution. *See* United States of America v. Scott, 2013 WL 5778318 (D.D.C. 2013).

The reason for reversals in cases of a Brady violation is to ensure fair trials: "...[n]ot punishment of society for the misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.' " Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. 1194 (1963); See also United States of America v. Avellino, 136 F.3d 249, 255 (2nd Cir. 1988)("The government's obligation to make such disclosures is pertinent not only to an accused's preparation for trial but also to his determination of whether or not to plead guilty. The defendant is entitled to make that decision with full awareness of favorable material evidence known to the government.").

While neither the D.C. Circuit nor the Supreme Court has spoken on whether a defendant can withdraw his guilty plea post-sentencing if he entered it without the government having disclosed exculpatory evidence it possessed, the majority of circuits to have considered the issue have held that a Brady violation can justify allowing a Defendant to withdraw a guilty plea. See United States of America v. Ohiri, 133 Fed.Appx. 555,562 (10th Cir. 2005); United States of America v. Avellino, 136 F.3d 249, 255 (2nd Cir. 1998); Sanchez v. United States of America, 50 F.3d1448, 1453 (9th Cir. 1995); White v. United States of America, 858 F.2d 416, 422 (8th Cir. 1988); Campbell v. Marshall, 769 F.2d 314, 322-24 (6th Cir. 1985); McCann v. Mangialardi, 337 F.3d 782, 788 (7th Cir. 2003)(finding that it is likely that the Supreme Court would find that the government has an obligation to disclose exculpatory evidence at the plea stage.)

Permitting a Defendant to move to withdraw a guilty plea he entered without having been given exculpatory evidence in the government's possession comports with the purpose of the prosecution's Brady obligation. In fact, in United States of America v. Nelson, 2013 WL 5778318 (D.D.C. 2013), the Court determined that in light of the balance of circuit court precedent and the purpose of Brady, the Defendant in Nelson was allowed to assert his Brady claim to argue that his guilty plea was not knowing and voluntary. *See* United States of America v. Nelson, 2013 WL 5778318 (D.D.C. 2013).

## IX. ARGUMENT:

Similar to the Defendant in the matter of United States of America v. Nelson, 2013 WL 5778318 (D.D.C. 2013), Mr. SHAPIRO's guilty plea before this Honorable Court was not knowing, intelligent, or voluntary, because it was made in the absence of withheld Brady evidence. Hence, when Mr. SHAPIRO elected to enter a guilty plea, his decision was in fact influenced by his appraisal of the government's case and he did not have the benefit of knowing the information that was withheld by the Government in this case.

Given Mr. SHAPIRO's well documented legal efforts, and insistence on obtaining the return of the investor monies stolen by Mr. Craig Currie and his continued protestations of innocence regarding the allegations that he "stole" anything from either Craig Currie or purported victim Robert Kallman, up and through the month before he self surrendered, and commencing as early back as 2007, there can be no question that if Mr. SHAPIRO would have had the exculpatory evidence withheld by the government which is the subject of the instant motion, he would have elected to go trial, and would have **never** entered a guilty plea.

The withheld Brady evidence is in fact exculpatory, as it clearly demonstrates Mr. SHAPIRO was free from fault, guilt or blame, with respect to the false allegations that were conjured up by the

supposed victim in Mr. SHAPIRO's case who is named in the criminal complaint—Mr. Robert Kallman. That is, without the Brady materials that were clearly withheld from Mr. SHAPIRO, the only evidence that Mr. SHAPIRO had of Mr. Robert Kallman's conduct of conjuring up a completely false story about Mr. SHAPIRO to the government and its agents, was the sworn affidavits of Mr. Craig T. Currie and his wife, Fanny Gallo, which were in fact presented to this Honorable Court during Mr. SHAPIRO's sentencing. **(See Exhibit "22" through Exhibit "24").** Nevertheless, Craig T. Currie's statement as set forth in the affidavits executed by Mr. SHAPIRO's former counsel, Mr. Guy Lewis and Mr. Michael Tein, could not be substantiated by independent evidence—i.e. Mr. SHAPIRO had no way of demonstrating through extrinsic evidence that what Craig T. Currie and Fanny Gallo were alleging was true—namely, that "...[o]ver the past year Mr. Robert Kallman has been calling me on an almost daily basis, no less than twenty times a day on some occasions....during these conversations Mr. Kallman is continually threatening to go to the District Attorney's Office and offers to help me if I will only admit to him that I conspired with Nevin Shapiro to 'rip him [Kallman] off...at no time was there ever a conspiracy between myself and Nevin Shapiro to steal from Mr. Kallman." **(See Exhibit "22" through "24").**

Without the withheld Brady evidence Mr. SHAPIRO had no way of corroborating the statements of Craig Currie and Fanny Gallo in 2007, and again in 2010, and was unable to confirm whether it was true that Robert Kallman was in fact trying to elicit false testimony from Craig T. Currie and his wife in an attempt to set Mr. SHAPIRO up to make it seem as though Mr. SHAPIRO stole monies from Robert Kallman, when such was not the case. Rather, as Mr. SHAPIRO has maintained since October 20, 2006, when he entered into a settlement agreement with Robert Kallman, it was Robert Kallman who breached a non-circumvent agreement when he made direct contact with Craig

T. Currie in order to "cut Mr. SHAPIRO" out of the **real and legitimate grey market diversion deals** that Mr. SHAPIRO was funding Mr. Craig T. Currie to undertake and complete for profit. **(See Exhibit "31")** Craig T. Currie was Mr. SHAPIRO's grey market contact, and Robert Kallman wanted to do business with Craig T. Currie directly in order to net a greater profit and exclude Mr. SHAPIRO. And, Robert Kallman actually engaged in the latter conduct, which is why Mr. SHAPIRO and Robert Kallman settled in October, 2006, on the advice of their respective attorneys. **(See Exhibit "31").**

The withheld Brady evidence affirmatively supports Mr. SHAPIRO's position, which he has held since at least 2006, which is that he is innocent as to the facts and allegations lodged in the criminal complaint, as he **never stolen any monies from Robert Kallman or Craig Currie**, the former who is the only victim named in the criminal complaint filed by the government on April 20, 2010. For example, as the withheld Brady evidence demonstrates, neither Craig T. Currie or his wife, Fanny Gallo, executed the sworn affidavits **prepared by Robert Kallman's attorney, Paula Colbath, on September 16, 2007. (See Exhibit "6" through Exhibit "12" and Exhibit "19").** That is, the withheld Brady evidence demonstrates that as alleged by Craig T. Currie and his wife, Fanny Gallo, Robert Kallman was in fact having his attorney prepare affidavits for Craig T. Currie and his wife, which falsely alleged Mr. SHAPIRO "conspired" with Craig T. Currie to steal from Robert Kallman. **(See Exhibit "6" through Exhibit "12" and Exhibit "19").** According to the withheld Brady evidence, one (1) month later, on October 10, 2007, counsel for Robert Kallman again attempted to have both Craig T. Currie and his wife execute "revised affidavits." **(See Exhibit "7").** The October 10, 2007, revised affidavits now reference the affidavits that were executed in May, 2007, by Craig T. Currie and his wife Fanny Gallo, both of which disavow the existence of any

"conspiracy" between Craig T. Currie and Mr. SHAPIRO to "steal" from Robert Kallman. **(See Exhibit "6" through Exhibit "12" and Exhibit "19" as compared to Exhibit "22" through "24").** Notably, the October 10, 2007, "revised affidavits" prepared by Robert Kallman's attorney were also not executed. **(See Exhibit "7").**

The withheld <u>Brady</u> evidence also demonstrates that Craig T. Currie and Fanny Gallo **consistently** refused to sign the completely false, and utterly ridiculous sworn affidavits prepared by Robert Kallman's attorney, and on November 6, 2007, Robert Kallman's counsel now elected to send multiple documents to Special Agent Michael Swangler, Special Agent, U.S. Department of Homeland Security, which do not include the false affidavits Robert Kallman was attempting to force Craig T. Currie to execute. **(See Exhibit "8" and Exhibit "9").** More importantly, the documents that Robert Kallman's attorney sent to the Department of Homeland Security actually consist of exculpatory evidence that supports Mr. SHAPIRO's defense–that he did not steal from Robert Kallman, but instead, Robert Kallman breached a non-circumvent, non-disclosure agreement that was freely and voluntarily executed by Robert Kallman, Mr. SHAPIRO, and Capitol Investments, back in 2002, and it was Craig Currie and Roberto Kallman who conspired to steal from Mr. SHAPIRO.

As yet another example of Robert Kallman's attempts to suborn perjury by attempting to have Craig T. Currie and Fanny Gallo execute false affidavits, and the parties unwillingness to execute same as reported to Mr. SHAPIRO, the next day, on November 7, 2007, Robert Kallman's attorney sent yet another letter to Special Agent Michael Swangler, Special Agent, U.S. Department of Homeland Security, which included: "Documents filed in the Curries' bankruptcy; and: **"The latest versions of the affidavits that Mr. And Mrs. Currie had AGREED to sign."** (See Exhibit "9").

If this Honorable Court will note, the word "agreed" is used, which connotes past-tense, and once again, counsel for Robert Kallman could not produce any executed affidavits as her client, Robert Kallman, had been attempting since 2006. **(See Exhibit "9").** More importantly, as the exculpatory, withheld <u>Brady</u> evidence demonstrates, neither Craig T. Currie or his wife, Fanny Gallo, had "agreed" to execute the affidavits prepared by Robert Kallman's attorney.

The withheld <u>Brady</u> evidence additionally indicates that on November 15, 2007, after not being able to obtain executed affidavits from Craig T. Currie and his wife, Fanny Gallo, on November 15, 2007, Robert Kallman had his attorney make contact with the bankruptcy trustee assigned to Craig T. Currie's New Jersey bankruptcy, and says nothing about any affidavits from Craig T. Currie and his wife, Fanny Gallo. **(See Exhibit "10").**

The withheld <u>Brady</u> evidence further demonstrates that as reported in the only evidence Mr. SHAPIRO had in his defense–the May 10, 2007, and 2006, affidavits freely and voluntarily executed by Craig T. Currie and his wife, Fanny Gallo–Robert Kallman was quite literally still harassing and intimidating Craig T. Currie and his wife, Fanny Gallo, into executing false affidavits through April, 2008. **(See Exhibit "12").** And, as evidenced by the withheld <u>Brady</u> documents, on April 1, 2008, Robert Kallman's attorney, Paul Colbath sent correspondence to Craig T. Currie's attorney–Mr. Paul W. Bergrin:

> "Paul: We remain **extremely concerned with Mr. Currie's lack of follow through on promised items. It is imperative that we be furnished with an update on the status of the "Shapiro Accounting," as we are being pressed BY ELBERG AD HIS COLLEAGUES for those and OTHER DETAILS.** By return mail, please furnish me with the name and contact information for the accountant preparing the accounting, so that I can independently confirm the status. I also await the written document you promised to send to me last week, but which I have yet to receive, which should include (among other things) **Mr. Currie's AGREEMENT TO**

**MEET WITH ELBERG very soon on the outstanding issue**. I trust you will make this your top priority."

**(See Exhibit "12").**

The withheld, exculpatory Brady evidence also indicates that on April 4, 2008, counsel for Craig

T. Currie, Paul W. Bergrin, forwarded correspondence to counsel for Robert Kallman which stated

as follows:

"Craig Currie agrees to assist and render **SUBSTITUTED COOPERATION in the legal investigation and any civil and or criminal action taken against Nevin Shapiro, his entities, corporations, and affiliates. Furthermore, Mr. Currie will provide any legal documentation to corroborate this position.**

**Currie agrees to provide a forensic accounting relevant to all monies owed and accounts receivable, hereafter known as the Shapiro Accounting by April 11, 2008."**

**(See Exhibit "13").**

Again, as evidenced by the withheld Brady evidence consisting of an April 23, 2008, email to

counsel for Craig T. Currie, contrary to the April 4, 2008, correspondence from counsel for Craig

T. Currie, as of April 23, 2008, Craig T. Currie had not sent counsel for Robert Kallman, the

"Shapiro Accounting." **(See Exhibit "13" through Exhibit "16").** And, as is evidenced by the

withheld Brady evidence, **AGAIN on April 23, 2008**, counsel for Robert Kallman sent an email to

counsel for Craig T. Currie, the subject line which read: "**NEVIN SHAPIRO ACCOUNTING.**"

And, which stated the following:

**" Paul: I am surprised I have not received this from you yet. Do you have it? What does it show? You have been promising this to US for weeks. What is going on? "**

**(See Exhibit "15").**

The withheld <u>Brady</u> evidence also indicates that only two (2) days later, on April 25, 2008, counsel for Robert Kallman reached out to counsel for Craig T. Currie, Mr. Paul W. Bergrin, again, and now stated:

> **"Subject: Call to Nevin Shapiro's Counsel...Paul: This will confirm our conversation in which you said you were expecting the Shapiro accounting 'forthwith', that you'll send us a copy of it, and that you will be calling Shapiro's counsel on Monday, (4/28) to demand immediate repayment of all amounts due from Shapiro and his businesses to Craigco. Obviously, if I misunderstood your game plan and timetable, please let me know ASAP, as this matter has become urgent."**

(See Exhibit "16").

Like clockwork, again on April 29, 2008, counsel for Robert Kallman sent yet another email communication to counsel for Craig T. Currie, which stated: "Paul: I need to follow up with ELBERG on some outstanding issues, but want to speak to you first. Also, did you call Nevin Shapiro yesterday (or his counsel) as you had promised, demanding immediate repayment of the amounts embezzled from Craigco? Please call me this morning to discuss. Time is of the essence."(See Exhibit "17").

Moreover, according to the withheld <u>Brady</u> evidence, on April 30, 2009, counsel for Robert Kallman again attempted to have counsel for Craig T. Currie execute the affidavits Craig T. Currie and his wife, Fanny Gallo, had previously refused to sign despite Robert Kallman's repeated requests of the latter to basically suborn perjury. **(See Exhibit "19").** And, now counsel for Robert Kallman went a step further and forwarded bank records from Robert Kallman demonstrating the latter wired $1 million dollars to Craig T. Currie's wife, Fanny Gallo. **(See Exhibit "19").** However, as Exhibit "32" demonstrates, Fanny Gallo's sworn testimony on March 11, 2010, makes it abundantly clear

that it was Craig T. Currie and Robert Kallman who were depositing monies in Fanny Gallo's accounts in order to hide the fact that Craig T. Currie and Robert Kallman were doing business behind Mr. SHAPIRO's back. **(See Exhibit "32").**

The government cannot deny the exculpatory nature of the withheld <u>Brady</u> evidence that is the subject of the instant motion, as the government agents which headed Mr. SHAPIRO's investigation themselves reported as follows: "FBI first started an investigation on Shapiro on or about 2008. However, SA Fredrick first joined the Shapiro investigation on or about October, 2009. He states that Shapiro was involved in a Ponzi scheme. **Initially the investigation focused on Shapiro's ex-business partner. Shortly thereafter, the investigation WENT COLD AND SA Frederick contemplated discontinuing the investigation. Subsequently, in or about March, 2010, FBI Newark Field Office obtained additional evidence and SA Frederick again focused on the investigation." (See Exhibit 30").**

Along that same vein, on April 26, 2010, according to FBI agent Greg Yankow's report, on April 26, 2010, Craig Currie contacted the latter and stated: "Hey Greg this is Craig Currie, Fanny Gallo's husband. Give me a call when you get a chance I want to update you on Fanny's fraud down here in New Jersey. I OVERLOOKED NEVIN's PONZI SCHEME FOR $900 MILLION. I know I was part of that whole scheme, but I want to bring Fanny into it, um, and uh get this law stuff going right away. Ok, give me a call."

Clearly, neither Craig Currie or Robert Kallman are believable witnesses and it is incredible that the government would have based a criminal complaint and indictment on the word of someone like Craig Currie and Robert Kallman, both of whom conspired against Mr. SHAPIRO, breached

contracts behind Mr. SHAPIRO's back, and likewise stole millions upon millions of dollars from Mr. SHAPIRO and his Capitol Investment's investors. Even worse, Mr. SHAPIRO was held accountable at sentencing for losses exclusively created by Craig T. Currie, together with Robert Kallman, yet the government held the key to proving Mr. SHAPIRO's allegations. Hence not only would have Mr. SHAPIRO persisted on with trial, he would have similarly been able to successfully reduce and challenge the loss amount imputed to Mr. SHAPIRO had he lost at trial, since at least $50 million in losses plus interest, were exclusively occasioned by Craig Currie's conduct.

Clearly, the government did not believe Craig Currie or Robert Kallman and his attorney, as if they had, the government would have never allowed Mr. SHAPIRO and Capitol Investments to continue operating from 2007, through 2010.

## X. CONCLUSION:

The facts set forth herein and the accompanying exhibits, conclusively demonstrate the Government committed a material, serious, Brady violation. And, without question, but for the described and documented Brady violation Mr. SHAPIRO would not have entered a guilty plea and would have otherwise gone to trial.

Based upon the foregoing facts, Mr. SHAPIRO respectfully requests this Honorable Court to vacate Mr. SHAPIRO's sentence and conviction, and likewise permit Mr. SHAPIRO to withdraw his previously entered guilty plea, as justice requires.

43

WHEREFORE, the Defendant, NEVIN KAREY SHAPIRO, respectfully requests this Honorable

Court to grant the instant Motion.

Dated: February 27, 2014

Respectfully submitted,

S/ *Maria Elena Pérez*
MARIA ELENA PÉREZ, ESQ.
Florida Bar No. 0487910
MARIA ELENA PÉREZ, P.A.
145 MADEIRA, SUITE 310
CORAL GABLES, FL. 33134
TEL. : (305) 461-3100
FAX : (305) 461-3444