

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

_____

*970 Broad Street, 7ᵗʰ floor*                          *973-645-2700*
*Newark, New Jersey 07102*

October 20, 2014

**VIA ECF**
Hon. Susan D. Wigenton
United States District Judge
Martin Luther King Building and U.S. Courthouse
50 Walnut Street
Newark, NJ 07102

      Re:   Nevin Shapiro v. United States
            <u>Civ. No. 14-cv-1316-SDW</u>

Dear Judge Wigenton:

      Please accept this letter brief in response to Petitioner Nevin Shapiro's motion to vacate, set aside, and correct his sentence pursuant to 28 U.S.C. § 2255 [14-cv-1316, Docket # 1].  For the reasons set forth below, this Court should deny Shapiro's § 2255 motion without a hearing.

Statement of Facts

      Defendant, Nevin Shapiro, was the founder, owner, and CEO of Capitol Investment USA, Inc. ("Capitol"), a wholesale grocery distribution business. Pre-Sentence Report ¶ 12.  Between January 2005 and November 2009, Shapiro and his coconspirators recruited investors for Capitol, promising large returns on their investments and supporting these claims with financial statements, tax returns, and invoices. PSR ¶¶ 17-20, 34-35, 37-39.  The recruitment efforts were successful, as Shapiro attracted over $930,000,000 from investors in New Jersey and throughout the country. PSR ¶¶ 21, 54.

      Unbeknownst to these investors, however, Capitol had no actual business.  PSR ¶ 22.  Instead, in classic Ponzi-scheme fashion, the money invested from later investors was used to pay earlier investors and to make lulling payments to continue the fraud. PSR ¶¶ 13, 23-24, 42, 54; A66, 68. The

invested money was also used to finance Shapiro's lavish Miami Beach lifestyle. PSR ¶ 27. Indeed, Shapiro misappropriated over $35 million for his personal use, which he used to pay for, among other things:

- between $5 million and $8 million in illegal gambling losses, PSR ¶ 25;
- hundreds of thousands of dollars worth of floor seat tickets to Miami Heat basketball games, PSR ¶¶ 25, 28;
- a $26,000 per month mortgage to pay for his over $5 million Miami Beach home, PSR ¶¶ 25, 28;
- a $1.5 million Riviera yacht, PSR ¶ 25;
- a $4,700 per month lease of a Mercedes-Benz S65 AMG car; PSR ¶ 25;
- outside business ventures, including a sports management business and several real estate ventures, PSR ¶ 27;
- gifts, including a pair of diamond-studded handcuffs for a prominent professional athlete, PSR ¶ 25; and payments, jewelry, and entertainment expenses for dozens of student athletes at a university in the Miami area;
- large donations to the athletic department of a university in the Miami area, resulting in an athlete lounge being named in his honor, PSR ¶ 26; and
- over $640,000 of personal expenses for him and his girlfriend charged to an American Express corporate card, PSR ¶ 28.

In late-2008, Shapiro began experiencing problems in making payments to investors. PSR ¶ 29. To hold off suspicion, Shapiro simply lied to the investors, blaming his vendors and others. PSR ¶ 29.  Finally, on November 30, 2009, several investors filed an involuntary bankruptcy petition against Capitol.  PSR ¶ 30.  As a result of Shapiro's scheme, over sixty investors lost in excess of $82 million.  PSR ¶¶ 54, 64-65, 72.

<u>Procedural History</u>

Shapiro was charged in a six-count Indictment with: one count of conspiracy to commit securities and wire fraud, in violation of 18 U.S.C. § 371; one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff(a), and 17 C.F.R. § 240.10b-5; two counts of wire fraud, in violation of 18 U.S.C. § 1343; and two counts of money laundering, in violation of 18 U.S.C. § 1957. 10-cr-471 (SDW), Docket # 12.  On September 15, 2010, pursuant to a written Plea Agreement, A35-43, Shapiro pleaded guilty before this Court to one count of securities fraud for executing a scheme to defraud dozens of victims, and one count of money laundering relating to a wire transfer of money (a lulling payment) to a victim identified with the initials J.Y., Docket # 16.  During his plea colloquy, <u>Shapiro admitted</u>:

- that he "from in or about January 2005, through on or about November 20, 2009, ... through Capitol, fraudulently obtain[ed] money from investors by falsely claiming that the money was going to be used in Capitol's grocery diversion business when in fact the money was used for [his] own personal benefit and to pay early investors from funds received from later investors;
- that "in fact, during [that] time ... Capitol had virtually no income generating business from in or about August 2007 through on or about November 30, 2009";
- that "to induce investors to send money to Capitol, [he] or other Capitol employees under [his] control provide[d] documents to investors, including promissory notes, joint venture agreements, and other evidence of indebtedness which reflected the amount the individual sent to Capitol and falsely promised specific returns";
- that "to further induce investors to send money to Capitol, [he] direct[ed] other Capitol employees to create and show investors fraudulent documents which falsely touted the profitability of Capitol's purported grocery diversion business";
- that those "documents include[d] false tax returns and financial statements, including profit and loss statements, which falsely represented that Capitol's grocery diversion business was generating tens of millions of dollars in sales";
- that those "documents also include[d] fictitious invoices which falsely reflected transactions purportedly entered into between Capitol and other companies in the grocery diversion business to fraudulently show sources of product and income";
- that those "invoices falsely state[d] that grocery or beauty products were shipped to a warehouse in Florida when in fact the products did not exist";
- that "after receiving funds sent to Capitol from investors to be used in the grocery diversion business, [he] improperly use[d] those funds to make principle and interest payments to existing investors";
- that he "misappropriate[d] approximately $35 million of funds investors sent to Capitol to be used in the grocery diversion business for [him]self";
- that he used the money for the various expenses listed in the bullet-points on page 2, above;
- that "through this fraudulent scheme, [he], through Capitol, raise[d] approximately $880 million from investors"; and
- that "the loss that resulted from the scheme [was] between $50 million and $100 million,"

Transcript of Plea Hearing, September 15, 2010, at pages 11-16.

Noting the seriousness of this offense, the "extensive nature and the massive aspects of this fraud," the harm to the victims, the need to protect the public from Shapiro, the need to deter others from this conduct, Shapiro's marginal acceptance of responsibility, and Shapiro's brazen conduct, the Court determined that the "Guidelines offense level of 35 [does not] accurately reflect[] the seriousness" of this crime.  The Court, therefore, determined that a two-level upward variance (to an offense level 37) was appropriate and it imposed a sentence of 240 months' imprisonment and ordered Shapiro to pay $82,657,362.29 in restitution.  Transcript of Sentencing Hearing, June 7, 2011, at pages 43-45.

Shapiro subsequently filed an appeal  [11-2628] with the Third Circuit Court of Appeals, and on November 30, 2012, the Third Circuit denied Shapiro's appeal and affirmed this Court's judgment.

Argument

A.  None of the Documents Shapiro Cites Constitute Brady Material

Shapiro has filed a petition pursuant to Title 28, United States Code, Section § 2255 requesting that this Court vacate his conviction and allow him to withdraw his previously entered guilty plea.  While the purpose of Shapiro's petition seems to be an attempt to blame others for his own substantial criminal misconduct, it is styled as a claim that the government withheld discovery to which he was entitled under Brady v. Maryland, 373 U.S. 83 (1963).  This claim is wholly without merit, and Shapiro's petition should be denied without a hearing.

Put simply, Shapiro has not referenced any material to which he was entitled under Brady.  Shapiro claims (without basis) that the documents he references reflect an individual (Robert Kallman) "conjuring up a completely false story about Mr. Shapiro to the government and its agents."  Petition at page 35.  But the documents Shapiro references with regard to Kallman reflect no such thing.  Shapiro somehow takes the fact that Kallman apparently made repeated requests that witnesses join him in making allegations against Shapiro about a scheme Kallman alleges Shapiro engaged in with Craig Currie to steal from Kallman, and leaps from there to the conclusion that such requests demonstrate that those allegations were false.  There is no basis for such a conclusion – the documents Shapiro cites appear entirely consistent with Kallman's allegations that Shapiro and Craig Currie engaged in a scheme to steal from Kallman.

Regardless, the allegations of Kallman on which Shapiro focuses are not the allegations with which Shapiro was charged and to which he pleaded guilty – they involve an entirely separate scheme which pales in comparison to the

$930 million Ponzi scheme with which Shapiro was charged and to which he pleaded guilty and was sentenced.  As a result, even were the documents to cast doubt on Kallman's reliability – which they do not – they would still not constitute <u>Brady</u> material, as they would not tend to exculpate Shapiro.[1]  The documents Shapiro lists as <u>Brady</u> materials are simply not exculpatory of the crimes Shapiro with which Shapiro was charged and on which this Court sentenced him.  While Craig Currie and Robert Kallman are the stars of Shapiro's victim-blaming fantasy version of Shapiro's criminal misconduct, neither are even alleged to have been among Shapiro's many victims.[2,3]

Shapiro's claims are particularly meritless having come after he entered a plea of guilty and admitted that he did commit the crime – a fact he still does not dispute.  <u>See</u> <u>Tollett v. Henderson</u>, 411 U.S. 258, 266-67 (1973) ("When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.").  While it may be an open question in the Third Circuit whether <u>Brady</u> requires disclosure of exculpatory information prior to entry of a guilty plea to an indictment[4], there is no need for

---

[1] Even accepting as true the dramatic leaps of logic Shapiro makes in his petition, the documents on which Shapiro focuses would at most have been discoverable –  <u>if</u> the Government intended to call Kallman or Currie at trial – as statements within the meaning of the Jencks Act or as impeachment material within the meaning of <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  Under the Court's Order for Discovery and Inspection, such material was due to be turned over only "sufficiently in advance of the witness's testimony to avoid delay in the trial."  Order for Discovery and Inspection, [10-471, Docket # 14].

[2] Shapiro additionally seems to argue that these supposedly withheld documents would have demonstrated that Currie had stolen money from Shapiro (though he fails to explain how the documents would establish that proposition),  and then jumps from there to suggest that such information would have enabled Shapiro to "successfully reduce and challenge the loss amount imputed to Mr. Shapiro had the lost at trial, since at least $50 million in losses plus interest, were exclusively occasioned by Craig Currie's conduct."  Petition at page 42.   Even were there actual evidence that Shapiro was defrauded by Currie, there is no legal theory under which that would reduce the loss amount resulting from Shapiro's Ponzi scheme.  As the government pointed out in responding to Shapiro's  "Motion Requesting Leave to Continue Sentencing" [10-471, Docket # 26] prior to sentencing, which raised essentially the same arguments as those raised here, "the Government has never disputed that Defendant Shapiro lost millions of dollars he invested with Currie.  It is not the case, however, that those losses triggered Defendant Shapiro's criminal conduct – Defendant Shapiro admitted in an interview with the Government that the transactions with Currie began only <u>after</u> he no longer had any legitimate sources of business of his own, and <u>years after</u> Defendant Shapiro began falsifying records to falsely make his business appear profitable in order to secure investments from unknown victims."  Shapiro has never disputed those points.

[3] Shapiro also includes paragraphs of factual assertions regarding his former attorneys from Shook, Hardy, and Bacon, as well as Guy Lewis and Michael Tien.  Given that Shapiro does not even claim to make a <u>Brady</u> allegation relating to any of those individuals, this brief does not address any issues raised by those factual assertions.

[4] <u>See</u> <u>United States v. Brown</u>, 250 F.3d 811, 816 n.1 (3d Cir. 2001) (noting that there is a split of circuit authority whether the Government must satisfy <u>Brady</u> prior to entry of a defendant's guilty plea).

the Court to address that issue here. "The focus of federal habeas inquiry is the … voluntariness of the plea, not the existence of an antecedent constitutional infirmity … [after entering a plea] … [h]e may only attack the voluntary and intelligent character of the guilty plea …" Tollett, 411 U.S. at 266-67. There can be no basis here to find that the fact that Shapiro did not have the documents he cites rendered his plea anything other than voluntary and intelligent. "The standard for materiality … in a case involving a guilty plea is whether there is a reasonable probability that but for the failure to disclose the Brady material, the defendant would have refused to plead and would have gone to trial." Sanchez v. United States, 50 F.3d 1448, 1454 (9th Cir. 1995) (citing Miller v. Angliker, 848 F.2d 1312 (2d Cir. 1988), which noted that the Supreme Court has considered the concept of materiality (or "prejudice" to the defendant) to be the same for claims of withheld evidence as for claims of ineffective assistance of counsel, citing Strickland v. Washington, 466 U.S. 668, 694 (1984) and United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J., using the "Strickland formulation" in a case involving withheld evidence)). Shapiro cannot possibly establish, to a reasonable probability, that he would have elected to go to trial if he had possession of this series of inconsequential documents relating to witnesses who would have most likely not been witnesses at a trial against him.

Shapiro's claims fail both because the material he references was, in fact, not Brady material, and because he cannot possibly show that his possession of these documents would have impacted his decision to plead guilty.[5]

B. Shapiro's Motion Should be Denied Without a Hearing

When considering a motion for post-conviction relief under 28 U.S.C. § 2255, "the question of whether to order a hearing is committed to the sound discretion of the district court." United States v. Day, 969 F.2d 39, 41 (3d Cir. 1992). In exercising this discretion, "the court must accept the truth of the movant's factual allegations, unless they are clearly frivolous on the basis of the existing record." Id. at 41-42 (citing Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir. 1989)). The movant is entitled to an evidentiary hearing as to the merits of their claim unless it is clear from the record that they are not entitled to relief. See United States v. Victor, 878 F.2d 101, 103 (3d Cir. 1989).

---

[5] Shapiro's claims fail for the additional reason that the documents he points to were, according to Shapiro, in the possession of the Trustee of the Bankruptcy proceeding to which Shapiro was himself a party, and he presumably could have obtained himself. The government is not required under Brady to furnish a defendant with information he already has or, with any reasonable diligence, he can obtain for himself. United States v. Dixon, 132 F.3d 192, 213 (5th Cir. 1997), quoting United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1984).

Conclusion

For the foregoing reasons, the United States respectfully submits that movant Nevin Shapiro's motion for post-conviction relief under 28 U.S.C. § 2255 should be denied without an evidentiary hearing.

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney


/s/ Jacob T. Elberg
By: Jacob T. Elberg
Assistant U.S. Attorney