UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEVIN KAREY SHAPIRO, | Civil Action No. 14-1316 (SDW) |
| Petitioner, | |
| v. | OPINION |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**WIGENTON**, District Judge:

Presently before the Court is the motion of Nevin Karey Shapiro ("Petitioner") to vacate, set aside, or correct his sentence brought pursuant to 28 U.S.C. § 2255.  (ECF Nos. 1, 10). Following this Court's Order to Answer (ECF No. 11), the Government timely filed a response to the motion.  (ECF No. 12).  Although Petitioner sought, and received, numerous extensions of time, Petitioner failed to file a reply brief.  (*See* ECF Nos. 13-16, 19, 21-25, 27-28, 30-33).  For the following reasons, this Court will deny Petitioner's motion and deny him a certificate of appealability.

## I.  BACKGROUND

As the Third Circuit explained in its opinion affirming Petitioner's sentence on direct appeal, Petitioner's conviction arises out of a

> Ponzi-type scheme between 2005 and 2009, in which he raised over $930,000,000 from investors throughout the United States.  As a result [of Petitioner's Ponzi scheme], over 60 investors lost more than $82,000,000 in investments.  [Petitioner], a compulsive gambler, spent lavishly during this time and racked up $9,000,000 in gambling debts.  To fund a life as a high-roller, [Petitioner] stole more than $35,000,000 from the investments he solicited.

> On July 14, 2010, [Petitioner] was indicted on two counts of money laundering, two counts of wire fraud, one count of securities fraud, and one count of conspiracy to commit securities and wire fraud.  Pursuant to a plea agreement, on September 15, 2010, [Petitioner] pleaded guilty to one count of money laundering in violation of 18 U.S.C. § 1957 and one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff(a).

*United States v. Shapiro*, 505 F. App'x 131, 131 (2012).

Pursuant to the agreement, Petitioner agreed to plead guilty to these two charges in exchange for the dismissal of the remaining counts of his indictment.  (Docket No. 10-471 at ECF No. 18 at 1).  The plea agreement Petitioner signed explained that he was subject to a statutory maximum sentence of 20 years for the securities fraud and 10 years for the money laundering charge, accompanied by appropriate fines, and that his sentence would be "within the sole discretion of the sentencing judge, subject to the provisions of the Sentencing Reform Act . . . and the sentencing judge's consideration of the United States Sentencing Guidelines . . . [which are] advisory, not mandatory."  (*Id.* at 2).  The agreement further provided that the Government made no recommendation or representation as to what guideline range the sentencing judge would find or as to what sentence Petitioner would ultimately receive.  (*Id.*).  Thus, although the parties agreed to certain stipulations as to the Guidelines to which each would waive their right to challenge were the Court to accept those stipulations, the agreement explicitly provided that the agreement "cannot and does not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties."  (*Id.* at 3).  Pursuant to these guidelines stipulations, the parties agreed to waive their appellate and collateral challenge rights in the event that the Court sentenced Petitioner to a sentence within the range applicable to a total Guidelines offense level of 35.  (*Id.* at 9).

This Court conducted Petitioner's guilty plea hearing on September 15, 2010. (Docket No. 10-471 at ECF No. 19). During that hearing, this Court engaged with Petitioner in an extended colloquy both as to his knowledge and understanding of the guilty plea he was choosing to enter, and as to the factual basis for that plea. During that colloquy, Petitioner stated to the Court that he had received at least some college education, that he was not under the influence of any substance that would prevent him from understanding the plea he was entering, that he was fluent in English, and that he had had a "complete opportunity" to speak with his attorney, with whose responses he was satisfied. (*Id.* at 3-4). The Court thereafter informed Petitioner that he would not be permitted to withdraw his plea once it was entered merely because he disputed his sentence, that his sentence would be imposed pursuant to the Court's discretion after consultation with the relevant sentencing factors and the Sentencing Guidelines, and that the sentencing recommendation contained in the plea agreement was not binding upon the Court at sentencing, all of which Petitioner stated he understood. (*Id.* at 4-5). Petitioner further stated that he had discussed the Guidelines with his attorney to his satisfaction. (*Id.* at 5-6). This Court thereafter informed Petitioner that, by virtue of his guilty plea, that he was waiving his trial rights including to the presumption of innocence and trial by jury, which Petitioner stated he understood. (*Id.* at 6). Petitioner then confirmed to the Court that he and his attorney had discussed the plea agreement, that he had had the agreement explained to him by his attorney, including having any questions answered, and that he had signed and agreed to the plea following those discussions. (*Id.* at 7-8). Petitioner also stated that he understood and agreed to the appellate waiver contained in that plea, through which he would have been barred from pursuing an appeal or collateral attack had the Court sentenced him to a sentence within the proposed Guidelines level of 35 contained in the plea agreement. (*Id.* at 8-9). Petitioner

also stated that he understood and accepted the stipulations in his plea agreement requiring an update to his tax returns.  (*Id.* at 10).

Having established that Petitioner understood the terms of his plea agreement and the nature of the plea he was entering, the Court then turned to the following factual basis:

> THE COURT: . . . All right.  During the period from in or about January 2005, through on or about November the 30th, 2009, did you live in Miami Beach, Florida?
>
> [Petitioner:] Yes, I did.
>
> The COURT: From in or about January, 2005, through on or about November 30th, 2009, were you the owner and Chief Executive Officer of Capital Investment, U.S.A., Inc.?
>
> [Petitioner:] Yes, I was.
>
> THE COURT: Did Capital have other employees, including a Chief Financial Officer, and other personnel that worked on Capital's financial matter?
>
> [Petitioner:] Yes.
>
> THE COURT: From in or about January, 2005, through on or about November 30th, 2009, did you, through Capital, fraudulently obtain money from investors by falsely claiming that the money was going to be used in Capital's grocery diversion business when in fact the money was used for your personal benefit and to pay early investors from funds received from later investors?
>
> [Petitioner:] Yes.
>
> THE COURT:  In fact, during this time, isn't it true that Capital had virtually no income generating business from in or about August, 2007, through on or about November 30th, 2009?
>
> [Petitioner:] Yes.
>
> THE COURT: To induce investors to send money to Capital, did you or other Capital employees under your control provide documents to investors, including promissory notes, joint venture agreements, and other evidence of indebtedness which reflected the

amount the individual sent to Capital and falsely promised specific returns?

[Petitioner:] Yes.

THE COURT: To further induce investors to send money to Capital, did you direct other Capital employees to create and show investors fraudulent documents which falsely touted the profitability of Capital's purported grocery diversion business?

[Petitioner:] Yes.

THE COURT: Did these documents include false tax returns and financial statements, including profit and loss statements, which falsely represented that Capital's grocery diversion business was generating tens of millions of dollars in sales?

[Petitioner:] Yes.

THE COURT: Did these documents also include fictitious invoices which falsely reflected transactions purportedly entered into between Capital and other companies in the grocery diversion business to fraudulently show sources of product and income?

[Petitioner:] Yes.

. . . .

THE COURT: Did these invoices falsely state that grocery or beauty products were shipped to a warehouse in Florida when in fact the products did not exist?

[Petitioner:] Yes.

THE COURT: After receiving funds sent to Capital from investors to be used in the grocery diversion business, did you improperly use those funds to make principle and interest payments to existing investors?

[Petitioner:] Yes.

THE COURT: Did you misappropriate approximately 35 million dollars of funds investors sent to Capital to be used in the grocery diversion business for yourself?

[Petitioner:] Yes.

THE COURT: In particular, did you improperly use funds investors sent to Capital to be used in the grocery diversion to: A, pay for at least approximately five to eight million dollars in debts resulting from gambling on sporting events?

[Petitioner:] Yes.

THE COURT: B, at least $200,000 you paid for floor seats to professional basketball games in Miami, Florida?

[Petitioner:] Yes.

THE COURT: C, you paid approximately $26,000 per month for the mortgage on your residence in Miami Beach . . . which was recently valued at approximately 5 million dollars?

[Petitioner:] Yes.

THE COURT: D, you paid approximately $7,250 per month for the payments on a 1.5 million dollar Riviera yacht?

[Petitioner:] Yes.

THE COURT: E, you paid approximately $4,700 per month for the payments for the lease on a Mercedes Benz X65 AMG?

[Petitioner:] Yes.

THE COURT: F, you paid for a pair of diamond studded handcuffs which you gifted to a prominent professional athlete?

[Petitioner:] Yes.

THE COURT: Did you also improperly used funds sent to Capital to be used in the grocery diversion business to make donations to the athletic program of a local university in the Miami, Florida area?

[Petitioner:] Yes.

THE COURT: Did you also improperly use funds sent to Capital to be used in the grocery diversion business to make payments or give gifts to dozens of student athletes who are attending the local university to which you made significant donations?

[Petitioner:] Yes.

THE COURT: Did these payments and gifts to student athletes include cash payments of up to $10,000 and gifts such as jewelry and entertainment expenses at various night clubs and restaurants in Miami Beach, Florida?

[Petitioner:] Yes.

THE COURT: On or about May 16th, 2008, did you send or cause to be sent a wire transfer of approximately $130,993.75 from Capital's account at Bank of America in Florida to Pershing LLC in New Jersey for the benefit of . . . an individual with the initials JY?

[Petitioner:] Yes.

THE COURT: Was this [payment] derived from the scheme to defraud the individuals who sent money to Capital for use in the grocery diversion business?

[Petitioner:] Yes.

THE COURT: Through this fraudulent scheme, did you, through Capital, raise approximately 880 million dollars from investors?

[Petitioner:] Yes.

THE COURT: Was the loss that resulted from the scheme between 50 million and 100 million dollars?

[Petitioner:] Yes.

THE COURT: Did your fraudulent activity result in more than 50 victims being harmed?

[Petitioner:] Yes.

THE COURT: Did you at all times act knowingly and willfully?

[Petitioner:] Yes.

THE COURT: And are you pleading guilty because you are in fact guilty of [one count of money laundering in violation of 18 U.S.C. § 1957 and one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff(a)]?

[Petitioner]: Yes.

(Docket No. 10-471 at ECF No. 19 at 11-16).  Based on this factual basis, and the Government's statements that, had the matter proceeded to trial, the Government would have proven the use of the means and instrumentalities of interstate commerce by Petitioner in committing money laundering and securities fraud, this Court accepted Petitioner's guilty plea.  (*Id.* at 16-18).

Petitioner returned for sentencing on June 7, 2011.  *Shapiro*, 505 F. App'x at 131.  At sentencing this Court "calculated an offense level of 35 and a criminal history category of I under the . . . Guidelines with a recommended sentence of 168 to 210 months' imprisonment."  *Id.* Following argument and an analysis of the sentencing factors, however, this Court determined that a two level upward variance was warranted in this matter based on Petitioner's leadership in his Ponzi scheme, the duration of that scheme, the magnitude of the loss involved, and Petitioner's continued "willingness to blame others and soil their reputations."  *Id.* at 132.  This Court thereafter sentenced Petitioner to a sentence of 240 months' imprisonment.  *Id.* at 131.  Petitioner appealed his sentence, and the Third Circuit affirmed, finding that the 240 month sentence was "procedurally sound" and that the two level upward variance was reasonable given the severity and nature of Petitioner's criminal conduct.  *Id.* at 132.  Petitioner thereafter filed his motion to vacate sentence.  (ECF No. 1, 10).

## II. DISCUSSION

### A.  Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his or her sentence.  Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act
> of Congress claiming the right to be released upon the ground that
> the sentence was imposed in violation of the Constitution or laws of

the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

**B. An evidentiary hearing is not required in this matter**

28 U.S.C. § 2255(b) requires an evidentiary hearing for all motions brought pursuant to the statute "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992). "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required." *Judge v. United States*, 119 F. Supp. 3d 270, 280 (D.N.J. 2015); *see also Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546. For the reasons set forth below, Petitioner's claims are without merit based on the record before this Court, and no hearing is required in this matter.

**C. Petitioner's Brady Claim**

In his chief claim, Petitioner contends that the Government withheld evidence in his criminal matter in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that this *Brady* violation rendered his guilty plea neither knowing nor voluntary. Under the *Brady* rule, the Government violates a criminal defendant's Due Process rights where it suppresses material evidence which is favorable to the defendant. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 432-34 (1995); *see also United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006). To establish a *Brady* violation, a petitioner must therefore show that "(1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment." *Risha*, 445 F.3d at 303. Evidence is considered material for *Brady* purposes where "there is a reasonable probability that pre-trial disclosure would have produced a different [result]" and the suppression of the evidence therefore "undermine[d] confidence in the outcome" of the petitioner's prosecution. *Id.* at 303 n. 5; *see also Kyles*, 514 U.S. at 434-35.

It remains an open question in this circuit whether a petitioner who pled guilty was entitled to *Brady* material before entering his plea, and the remaining circuits are split as to that question. *See, e.g., United States v. Brown*, 250 F.3d 811, 816 n. 1 (3d Cir. 2001) (noting circuit split and assuming "for the sake of argument, [without so holding], that *Brady* may require the government to turn over exculpatory information prior to entry of a guilty plea"); *United States v. Avellino*, 136 F.3d 249, 255 (*Brady* applies to cases involving a guilty plea); *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995) (same); *Matthew v. Johnson*, 201 F.3d 353, 360-62 (5th Cir. 2000) (explaining that the purpose of the *Brady* rule was to ensure fair consideration of guilt by a jury or judge in a bench trial, and that a guilty plea likely waives any *Brady* violation as to the guilt phase);

*United States v. Conroy*, 567 F.3d 174, 178 (5th Cir. 2009) (guilty plea precludes *Brady* claim); *see also United States v. Ruiz*, 526 U.S. 622, 633-34 (2002) (Thomas, J., concurring in the judgment and suggesting that the "principle supporting *Brady* was avoidance of an unfair trial [for] the accused [which is] not implicated at the plea stage").  While the Court has extended *Brady* to include a requirement that material impeachment evidence be provided to a criminal defendant, *see Giglio v. United States*, 405 U.S. 150, 154 (1972), the Supreme Court has explicitly held that the Constitution does not require the "pre[-]guilty plea disclosure of impeachment information." *Ruiz*, 536 U.S. at 629.  To the extent that *Brady does* apply in the guilty plea context, evidence in that context would only be material if "but for the failure to disclose the *Brady* material, the defendant would have refused to plead guilty and would have gone to trial."  *Sanchez*, 50 F.3d at 1454.

Even assuming for the sake of argument that a petitioner can maintain a *Brady* claim in the pretrial guilty plea context, Petitioner's claim fails.  In his petition, Petitioner provides numerous documents which show that one of the individuals he apparently defrauded, Robert Kallman, personally and through counsel, sought to obtain the help of others involved in Petitioner's business affairs, specifically Craig Currie and his wife, to help him prove that Petitioner had defrauded Kallman.  While Petitioner contends that these documents indicate that Kallman was attempting to frame him by inventing false charges against Petitioner, these documents show no such thing.  Instead, these documents indicate that Kallman sought to have others help him prove Petitioner's financial ill-deeds, and did so through various means.  It does not follow from anything other than Petitioner's own denials that Kallman's allegations are false simply because he sought but could not obtain the help of Currie and his wife in bringing claims against Petitioner.  Instead, Kallman's fervent attempts are entirely consistent with Kallman's assertion that Petitioner had

stolen from him.  That Currie and his wife eventually signed affidavits asserting that they had not helped Petitioner steal from Kallman likewise does not make the documents Petitioner has submitted show Kallman's allegations to have been false.  Even if this Court were to construe the documents to suggest something untoward about Kallman, those documents at best would therefore have gone to the reliability and credibility of Kallman as a witness.  As explained above, the Government is not required to turn over documents going only to the impeachment of a potential witness prior to a guilty plea, and such potential impeachment information therefore cannot form the basis of a *Brady* claim, especially in light of the fact that it is not entirely clear that Kallman would have been a witness at trial.  *Ruiz*, 526 U.S. at 629-34.

Petitioner's *Brady* claim is likewise negatively impacted by the fact that Kallman was at best a small part of the schemes with which Petitioner was charged and to which he pled guilty. Indeed, in the original criminal complaint in this matter, Kallman was mentioned only to the extent that he was one of the investors that Petitioner paid off using money misappropriated as part of Petitioner's Ponzi scheme.  (Docket No. 10-471 at ECF No. 1).  As the Government argues, Petitioner's dealings with Kallman were thus largely tangential to the massive securities fraud scheme at the center of this case, and those interactions with Kallman at best were but a small part of the crimes with which he was charged.[1]  Given the tangential involvement of Kallman, the sheer size of the scheme in which Petitioner was engaged, the significant amount of money Petitioner lost or misappropriated from his investors, and the over sixty additional victims involved in Petitioner's Ponzi scheme, there is no reasonable probability that, but for his lack of possession of documents showing that Kallman was attempting to recover from Petitioner's "theft" of his

---

[1] Indeed, the Government contends that neither Craig Currie nor Robert Kallman "are even alleged to have been among Shapiro's many victims."  (ECF No. 12 at 5).

12

moneys or to have Petitioner criminally charged Petitioner would not have pled guilty as these documents do little to even challenge the credibility of Kallman, let alone provide any truly exculpatory information.  As such, these documents were neither exculpatory nor material, and cannot form the basis of a *Brady* claim sufficient to show that Petitioner's plea was rendered involuntary or unknowing.  Petitioner's plea-related *Brady* claim must therefore be denied.

Petitioner also asserts, however, that the denial of documents as to Kallman and Currie also amounts to a denial of requested *Brady* evidence in advance of his sentencing.  In essence, Petitioner's claim is that, had he had these documents, he could show that he lost significant amounts of money in his interactions with Currie.  Petitioner's argument thus essentially is that he could have used this information as an offset to the loss amount with which he was attributed at sentencing.  The inherent problems with this argument, however, are that the Government never disputed that Petitioner lost money in his dealings with Currie, and Petitioner has provided no legal support for the assertion that he can offset the money his investors lost in his Ponzi scheme based on money he and his business lost in separate dealings with Currie.  What's more, the only documents Petitioner provides which actually support his current assertions are those created and maintained by his company's own attorneys prior to his criminal prosecution in this matter, which suggests Petitioner had access to the information he claims he was denied.  In any event, Petitioner has provided no support for the assertion that he can offset his victims' losses in his Ponzi scheme with the losses he allegedly suffered in mis-dealings with Currie, and this Court is aware of no such authority.  Because Petitioner can therefore not establish that, but for his lack of the documents he now contends are *Brady* material, he would have received a lesser sentence, he cannot show that these documents were material to his sentencing, and his *Brady* claim on that basis must also fail.  *Kyles*, 514 U.S. at 434-35; *Risha*, 445 F.3d at 303.  Because both of

13

Petitioner's *Brady* claims are therefore without merit, Petitioner is not entitled to relief pursuant to *Brady* and its progeny.

### E.  Petitioner's remaining claims

While Petitioner's original petition (ECF No. 1) contained only Petitioner's *Brady* claims, in his duplicate petition (ECF No. 10), Petitioner sought to add several other claims in which he essentially asserts that his criminal prosecution is the result of some mass conspiracy brought on by Guy Lewis, one of the attorneys hired to represent the interests of his company during the course of the Ponzi scheme.  The central contention in this alleged conspiracy is that Guy Lewis was previously a United States Attorney, and was part of the team that brought criminal charges against and convicted Petitioner's step-father, and that Lewis therefore "recruited" Petitioner through his law partner and hid allegedly exculpatory evidence which would have proven Petitioner's innocence, resulting in Petitioner's conviction.  Petitioner contends that these actions were undertaken out of some sense of revenge on the part of Lewis.  The document Petitioner chiefly contends was hidden from him was a short deposition in which Craig Currie's estranged wife told Petitioner's company's attorney, Lewis, that Currie had been involved with many people, had "stolen" some amount of money from Petitioner at some unknown point, that Currie had done dealings with Robert Kallman behind Petitioner's back, and that Currie had on his staff a large, threatening man he used to intimidate people.  (Document 32 attached to ECF No. 1).  This interview, such as it is, in no way establishes Petitioner's innocence, nor is it actually exculpatory – at best it establishes a point which was not in contention during Petitioner's plea and sentencing, that Currie had cheated Petitioner out of some amount of money and had had some dealings with Kallman.

While Petitioner contends that this conspiracy amounts to claims of "excessive federalism,"[2] ineffective assistance of counsel by a lawyer hired by his company who never actually entered an appearance on his behalf in his criminal case, and show that he is actually innocent, in making these claims Petitioner is essentially seeking to contradict his own solemn declarations made in open court in which he admitted his guilt and admitted to the operation of a Ponzi scheme resulting in tens of millions of dollars of losses for his over sixty victims.   As  the Supreme Court has explained,

> the representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in open court carry a strong presumption of verity.  The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible. . . .

> . . . [T]he barrier of the plea or sentencing proceeding record, although imposing, is not invariably insurmountable [however].  In administering the writ of habeas corpus and its § 2255 counterpart, the federal courts cannot fairly adopt a per se rule excluding all possibility that a defendant's representations at the time his guilty plea was accepted were so much the product of such factors as misunderstanding, duress, or misrepresentation by others as to make the guilty plea a constitutionally inadequate basis for imprisonment.

*Blackledge v. Allison*, 431 U.S. 63, 73-75 (1977); *see also United States v. Erwin*, 765 F.3d 219, 230 (3d Cir. 2014) (applying *Blackledge*); *United States v. Dickler*, 64 F.3d 818, 823 n. 7 (3d Cir. 1995) ("Sworn statements in a plea proceeding are conclusive unless the movant can demonstrate

---

[2] Petitioner's "excessive federalism" claim appears to be an attempt to restate both his *Brady* claim and conspiracy allegations as a violation of the Tenth Amendment upon the part of the Government.  Petitioner does not explain *how* these claims violate the Tenth Amendment as opposed to Due Process or the like, and thus the excessive federalism claim fails for the same reasons that his *Brady* and conspiracy claims are without merit.

compelling reasons for questioning their truth"); *United States v. Stewart*, 977 F.2d 81, 84 (3d Cir. 1992) ("The ritual of the colloquy is but a means toward determining whether the plea was voluntary and knowing.  A transcript showing full compliance with the customary inquiries and admonitions furnishes strong, although not necessarily conclusive, evidence that the accused entered his plea without coercion and with an appreciation of its consequences").

Thus, to the extent Petitioner is trying to negate his open admissions before this Court during his plea, Petitioner faces a high hurdle indeed.  In support of his claim that he was somehow the subject of a revenge conspiracy on the part of Guy Lewis, who Petitioner portrays in his allegations as the puppet master in control of at least two offices of United States Attorneys, Petitioner offers little more than his own conclusory allegations that Lewis "recruited" Petitioner's business in dealing with Capital's issues with Craig Currie, and used that "recruitment" to create a vast conspiracy to have Petitioner imprisoned out of some misguided sense of revenge born of Lewis's previous prosecution of Petitioner's step-father for a Ponzi scheme undertaken in the mid to late 1990s.  The documents Petitioner provides in his motion provide no support for the contention that Petitioner's prosecution was the result of some conspiracy, and instead indicate that his lawyers attempted to help Petitioner decide whether or not to bring suit against Currie following Petitioner's failed dealings with Currie.  These documents thus provide no support for Petitioner's allegations of conspiracy.  Petitioner has thus provided nothing more than conclusory allegations of a revenge scheme by Lewis supported only by vague contentions which are wholly incredible based on the record before the Court, the combination of which are patently insufficient to overcome the strong presumption that Petitioner's admissions of guilt during his plea colloquy were truthful.  Petitioner's claim that he was subject to a conspiracy and that he is innocent must

therefore be dismissed as they are precluded by Petitioner's own admission of his guilt in his plea hearing.  *Blackledge*, 431 U.S. at 73-75; *see also Dickler*, 64 F.3d at 823 n. 7.

Even were this Court to construe this claim as a claim expressing Petitioner's actual innocence, which appears to be the only basis for Petitioner's claim, Petitioner is still not entitled to relief.  Claims of actual innocence have classically served as gateway claims through which a court may reach an otherwise barred or defaulted claim, rather than a stand-alone basis for relief.  *See, e.g., McQuiggan v. Perkins*, --- U.S. ---, ---, 133 S. Ct. 1924, 1934-46 (2013).  Indeed, even as a gateway claim, actual innocence will only be established where a petitioner shows "that it is more likely than not that no reasonable juror would have convicted him" in light of some newly raised evidence.  *Id.* at 1935; *see also Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007).  A petitioner is not entitled to relief simply because he asserts his innocence, instead he must actually show his innocence by way of "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented" prior to his conviction.  *Hubbard v. Pinchak*, 378 F.3d 333, 339-50 (3d Cir. 2004).  Because of the high standard applicable to such a claim, claims of actual innocence have "in virtually every case . . . been summarily rejected."  *Hubbard*, 378 F.3d at 341.  While the Supreme Court has at times accepted for the sake of argument that a "truly persuasive" actual innocence claim would warrant relief even in the absence of a substantive constitutional violation, the Court has never explicitly so held.  *See Herrera v. Collins*, 506 U.S. 390, 400-417 (1993); *see also District Att'y's Office For Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71-72 (2009).  The Court has stated, however, that if a stand-alone claim of actual innocence were viable, the level of proof required to make out such a claim would be even greater than that required for a gateway innocence claim.

Here, Petitioner has not shown his innocence, but merely asserted it. Petitioner has provided nothing in support of his innocence claims but his own allegations of a wild conspiracy by his company's own legal representation, and those innocence claims are directly contradicted by his own admissions of guilt during his plea colloquy as explained above. He has thus clearly not met even the lower bar to which gateway claims of actual innocence are subject as he has provided no new evidence sufficient to lead this Court to question the validity of his plea, and has certainly failed to show his entitlement to relief on a stand-alone innocence claim as a result. *Hubbard*, 378 F.3d at 339-50. Petitioner has not overcome the presumption that his statements in open court were true and accurate, and he has not shown his entitlement to relief under a theory of actual innocence.

To the extent Petitioner attempts to raise a claim of ineffective assistance of counsel against Guy Lewis, the Court first must note once again that Lewis was an attorney hired by Petitioner's company, Capital, and while his partner briefly represented Petitioner for about a month in Petitioner's criminal prosecution, it was Petitioner's current attorney, rather than Lewis or his partner, who represented Petitioner during the vast majority of his prosecution. The *Strickland* "ineffective assistance of counsel [standard] applies only to criminal proceedings [b]ecause there is no constitutional right to effective assistance of counsel in civil proceedings." *Chase v. City of Philadelphia*, 611 F. App'x 67, 68 (3d Cir. 2015). To the extent that Petitioner asserts ineffective assistance of counsel prior to the entry of his current attorney's entry of appearance approximately a month after Petitioner was arrested in his criminal case, he must show both that his previous attorney was both constitutionally defective and that he was prejudice as a result of counsel's deficient performance. *Strickland v. Washington*, 466 U.S 668, 687-694 (1984). To show deficient performance, Petitioner must show that "counsel made errors so serious that counsel was

not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). Even if he can show deficient performance, Petitioner must also show that his counsel's deficient performance prejudiced his defense by showing that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693-94. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant a hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

Here, Petitioner's claim of ineffective assistance arises solely out of his unsupported allegation that Guy Lewis engaged in a conspiracy to recruit, betray, and prosecute Petitioner. Lewis, however, never entered an appearance on Petitioner's behalf in this matter, and his partner, Michael Tien, represented Petitioner for less than a month, entering an appearance the day after Petitioner's arrest and being replaced by Petitioner's current attorney less than a month later in May 2010. (*See* Docket No. 10-471 at ECF Nos. 5, 11). Petitioner does not explain how Tien was ineffective, nor does he assert that his current counsel was herself ineffective. It was Petitioner's current counsel who advised Petitioner throughout the plea and sentencing progress, and it was current counsel who signed and agreed to the guilty plea. Thus, it is clear that Petitioner has failed in any way to show that Lewis ever acted as his attorney in his criminal matter, and has likewise

19

failed to show any way in which Lewis or Tien were ineffective *in the course of his criminal prosecution*, as opposed to while acting as his private, civil attorneys in his business dealings.  Any failings those attorneys may have had as Capital's lawyers, while perhaps subject to civil suit, have no bearing on the outcome of Petitioner's current motion to vacate sentence, and Petitioner's vague allegations of conspiracy do not change this fact.  *Chase*, 611 F. App'x at 68.  Petitioner has failed to establish ineffective assistance, and any claim on that basis must therefore be denied.

In his final claim, Petitioner contends that this Court was bound to the obligations of the contract between the Government and Petitioner in the form of Petitioner's plea agreement, and that this Court therefore denied him his rights by sentencing Petitioner to a sentence greater than that suggested by the stipulations contained in the plea agreement and its attached exhibits.  Petitioner's argument is based on two faulty assumptions – that this Court was absolutely bound by the plea agreement, and that the Court in any event "violated" any portion of the plea agreement by giving him an upward variance at sentencing.  As the Third Circuit reiterated when Petitioner challenged his sentence on direct appeal, this Court "was under no obligation to follow the sentence recommendation in the plea agreement[, and a] request to vacate [Petitioner's] plea [on such a basis] is wholly unsupported."  *Shapiro*, 505 F. App'x at 132 n. 2.  This is because Rule 11 specifies that a sentencing court is only bound by a sentencing recommendation in a plea agreement where the Court has accepted that agreement and the parties in the agreement agreed "that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply."  Fed. R. Crim. P. 11(c)(1)(C).  Other forms of recommendations or stipulations not to oppose arguments in a plea agreement do not bind the Court.  *See* Fed. R. Crim. P. 11(c)(1)(B); *see also United States v. Bernard*, 373 F.3d 339, 343 n. 5 (3d Cir. 2004).

In this matter, Petitioner's plea agreement specifically informed him that the sentence he would receive under the agreement was "within the sole discretion of the sentencing judge" based on the judge's consideration of the relevant sentencing factors and the Guidelines, which are advisory and not mandatory upon this Court. (Docket No. 10-471 at ECF No. 18 at 2). While the plea agreement contained numerous stipulations that the parties made regarding the Guidelines, the plea agreement also specifically stated that these stipulations did "not bind the sentencing judge, who may make independent factual findings and may reject any or all of the stipulations entered into by the parties." (*Id.* at 3). Thus, the plea agreement Petitioner signed and entered into did not purport to bind this Court, and as it provided only stipulated recommendations as to the appropriate guidelines finding, recommendations which the agreement itself stated did not bind the Court, Petitioner's argument that the Court should have been bound by the agreement is, at best, disingenuous. Because the agreement did not bind this Court, the Court did not err in departing upward to provide Petitioner with a sentence greater than that recommended in the plea agreement. *Shapiro*, 505 F. App'x at 132 n. 2. Likewise, because the agreement specifically stated that the Court was not bound by anything in the stipulations or otherwise contained in the agreement, the Court's upward departure did not violate, interfere with, or otherwise prevent Petitioner from receiving the benefit of the bargain that was his plea agreement. What occurred at Petitioner's sentencing was explicitly addressed in the agreement Petitioner signed – that this Court could vary Petitioner's sentence in its sole discretion and that the Court was not bound by recommendations contained in the agreement – and Petitioner cannot now claim that his plea agreement was violated when that exact occurrence came to pass at sentencing. Nothing this Court did at sentencing "violated" Petitioner's plea agreement "contract" with the Government, nor did this Court err in giving Petitioner an upward variance at sentencing. *Id.* Petitioner's contract claim

21

is therefore without merit.  Because all of Petitioner's claims are without merit, Petitioner's motion to vacate sentence is denied.

## III.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c) the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  For the reasons expressed above, none of the claims Petitioner raises in his motion to vacate are "adequate to deserve encouragement to proceed further" as they are all without merit, and jurists of reason would not disagree with this Court's resolution of his claims.  As such, Petitioner has failed to make a substantial showing of the denial of a constitutional right, and a certificate of appealability is denied.

## IV.  CONCLUSION

For the reasons set forth above, Petitioner's motion to vacate his sentence (ECF No. 1, 10) is DENIED, and Petitioner is DENIED a certificate of appealability.  An appropriate order follows.

Dated: March 6, 2017                           *s/ Susan D. Wigenton*
                                                Hon. Susan D. Wigenton,
                                                United States District Judge